EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ VELÁZQUEZ ÁLVAREZ, acusado y apelante.

Núm. 14387.—*Sometido:* Noviembre 7, 1950. *Resuelto:* Enero 23, 1951.

*Jorge L. Córdova*, abogado del apelante; *Hon. Procurador General Vicente Géigel Polanco* y *J. Rivera Barreras, Fiscal del Tribunal Supremo,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

José Velázquez Álvarez fué convicto por un jurado del delito de asesinato en segundo grado. Denegada su moción de nuevo juicio fué sentenciado a cumplir de diez a quince años de presidio. Otra acusación contra el acusado, por infracción a la Ley sobre Registro de Armas, fué sometida por la misma prueba presentada en el caso de asesinato y la corte le declaró culpable y sentenció a cumplir dos meses de cárcel. No conforme con las sentencias y la resolución denegatoria del nuevo juicio el acusado apeló[1] y en su alegato sostiene, entre otros errores señalados, que la corte inferior erró al no declarar un *mistrial* con motivo del comentario del fiscal al jurado sobre el hecho de que el acusado no declarara.

No constan en la transcripción de la evidencia las palabras exactas pronunciadas por el fiscal en su informe al jurado y las cuales, según el apelante, eran suficientes para que la corte decretara un *mistrial.* Veamos el incidente según aparece de dicha transcripción:

"*La Corte:* El fiscal.

"*Sr. Fiscal:* (Consume su turno de refutación.)

[1] No habiendo el apelante imputado error alguno a la corte inferior en el caso sobre registro de armas y apareciendo de la transcripción de evidencia, pág. 171, que él admitió que no tenía arma alguna inscrita, procede la confirmación de la sentencia en dicho caso.

"*Sr. Defensor:* (Interrumpiendo al fiscal.)    Sr. Juez, yo no he oído las frases bien, tengo la impresión de que el fiscal dirigiéndose al jurado ha dicho que por qué el acusado no se sentó a aclarar lo que había pasado.   El tribunal me dirá si eso es así o no.

"*La Corte:* Lo que el fiscal dijo es, que, *si mi memoria no me es infiel,* que como la defensa había preguntado que por qué no se había probado el motivo que tuvo el acusado para matar a Lidia, a la interfecta, dice el fiscal, que él le pone la pregunta a  la inversa, *que por qué se suicidó la interfecta,* si fué suicidio como pretende la defensa, *porque el único que se encontraba en aquel cuarto con Victorina era el acusado, que por qué no ha explicado con su prueba el motivo que tuvo Victorina para suicidarse.*

"*Sr. Defensor:* ¿Por qué el acusado no ha explicado con su prueba lo que hizo ella?

"*Sr. Fiscal:* Exacto.

"*Sr. Defensor:* Nosotros entendemos que esta cuestión es lesiva a los intereses del acusado y vamos a levantar una cuestión; solicitamos respetuosamente que se disuelva el jurado, que se decrete un *mistrial,* por lesionar esta situación los intereses del acusado.

"*Sr. Fiscal:* No hay razón para eso, Sr. Juez.

"*La Corte:* Sin lugar.

"*Sr. Defensor:* Excepción, respetuosamente."   (Bastardillas nuestras.)

Como puede verse, la corte no censuró las palabras del fiscal ni dió instrucciones al jurado, en ese momento, en cuanto a que no debían tomar en consideración al considerar la prueba, las manifestaciones hechas por el fiscal.   Fué más tarde, cuando trasmitió sus instrucciones generales, que se refirió a este incidente diciendo:

"Por un precepto expreso de la ley el acusado puede o no declarar, según él así lo desee.   Es un privilegio que él tiene, un privilegio sagrado que él tiene.   Un derecho que le da la ley. En este caso el acusado no ha declarado.   El hecho de no hacerlo no ha de considerarse como circunstancia que le incrimine, pues el fiscal está en la obligación de establecer su culpabilidad más allá de una duda razonable, prescindiendo de tal omisión.

"Es bueno decir ahora, con motivo del incidente que levantó la defensa por mor de una manifestación que hizo el fiscal al decir que no se había presentado evidencia de la causa que motivó el suicidio de Victorina, que las partes no pueden comentar el silencio del acusado, porque el acusado no está obligado a declarar; que los informes de los fiscales y de los abogados defensores son únicamente argumentos y que no son evidencia en el caso; que deben tener en cuenta que los argumentos tanto del fiscal como de la defensa no constituyen evidencia en el caso y sí lo hacen para cada uno de ellos tratar de esclarecer la verdad con sus argumentos, *como ellos mejor crean,* a los fines de que se haga por ustedes la justicia que cada uno de ellos cree que es la justicia; que lo único que los obliga a Uds. es la prueba desfilada ante ustedes aquí y la ley que yo diga cuál es en las instrucciones. De modo que, aunque el fiscal, a mi juicio, no comentó el silencio del acusado, porque él no dijo que el acusado no había declarado, él no quiso decir eso, sino que no se presentó prueba relativa al suicidio a cuál fué la causa del suicidio, lo que sí quiso hacer fué simplemente un argumento, pero por si hubiere hecho cualquier manifestación que yo creo que no la hizo, en sus argumentos, ustedes no deberán para nada tener en cuenta eso en absoluto por tratarse de meros argumentos. Como la solicitud de la defensa en ese sentido fué hecha en presencia de ustedes, también la resolución fué hecha en presencia de ustedes. Quiero decirles además que el fiscal viene en la obligación de probarles a los acusados su caso más allá de una duda razonable. Por eso quiero advertirles que deben borrar de sus mentes cualquier argumento que pueda haberse hecho en el sentido que ya les he explicado. . . ." (Bastardillas nuestras.)

Arguye el apelante que el primer error señalado fué cometido y fué perjudicial a los derechos del acusado porque la conducta del fiscal fué altamente impropia al comentar el silencio del acusado, conducta que no fué censurada por la corte en ningún momento; porque no se dieron instrucciones inmediatamente al jurado y que el error no fué subsanado en las instrucciones finales, ya que la corte dijo al jurado, en un caso como éste en el cual hubo un argumento impropio del fiscal, que si bien los argumentos de las partes no son evidencia en el caso, con dichos argumentos ellos tratan de

esclarecer la verdad "como ellos mejor crean"; que con esta instrucción la corte colocó el argumento impropio del fiscal en el mismo plano que el argumento lícito.

Para una mejor comprensión del alcance de las palabras pronunciadas por el fiscal (según las reconstruyó la corte) es conveniente hacer un sucinto resumen de los hechos del caso según las teorías de las partes.[2]

El fiscal sostuvo que probaría, con evidencia circunstancial, excepción hecha de una admisión del acusado, que éste, quien vivía maritalmente con Victorina García Rosado, y estando ellos solos en la noche del 29 de octubre de 1947 en la habitación en que vivían, le hizo dos disparos con un revólver calibre .38; que un disparo fué a dar en una pared en la cual se encontró la perforación de la bala, y el otro fué hecho a menos de doce pulgadas de la sien derecha de Victorina, estando ésta acostada desnuda en la cama, disparo que también atravesó el mosquitero, causándole la muerte a Victorina instantáneamente; que el acusado esa misma noche le admitió al fiscal Gerena Bras, mientras practicaba la investigación del caso, que él había matado a Victorina, aunque también le negó el hecho y le dijo que ella se había suicidado. La prueba de cargo, si bien tendió a demostrar algunos de esos hechos, también demostró que al llegar varios vecinos frente a la habitación del acusado al oír los disparos, éste salió llorando y dijo que Victorina se había matado; que él fué a buscar a la policía y también les dijo lo mismo; que en el cuartel de la policía el acusado contestó a la pregunta del fiscal "¿por qué hizo eso?", diciendo: "Yo la maté,

[2] En cuanto a la teoría de la defensa, la hemos encontrado en las instrucciones de la corte al jurado ya que el taquígrafo que actuó en el caso, Sr. Pedro R. Arroyo, si bien tomó taquigráficamente y transcribió la teoría de cargo expuesta por el fiscal al comenzar el caso, no tomó ni transcribió la teoría expuesta por el abogado defensor. Hemos resuelto en *Pueblo* v. *Negrón*, 37 D.P.R. 822, 825, que corresponde al apelante suministrar a este Tribunal "una transcripción completa demostrativa de lo que dijo en su informe". Es obvio, por lo tanto, que los taquígrafos deben tomar taquigráficamente, tanto el informe preliminar del fiscal como el del abogado defensor, en los cuales exponen al jurado las teorías de sus casos, con el fin de que luego puedan ser transcritos.

métame a la cárcel", pero cuando el fiscal le pidió que expli-
cara por qué lo había hecho, el acusado contestó: "¿Cómo
usted cree que yo voy a matar a mi esposa?" (T.E. págs.
92, 95, declaración del policía Jaime Roche Díaz); que a
otro policía, José Ramón Santos, el acusado le dijo: "He me-
tido la pata, le he dicho al fiscal que yo maté a mi esposa"
(T.E. pág. 123).

Demostró, además, la prueba de cargo que el cadáver des-
nudo de Victorina García apareció tendido en el suelo boca
abajo, al lado de la cama, con una herida de bala en la sien
derecha, de la cual había manado mucha sangre que estaba
en el piso; que el disparo dejó tatuaje alrededor de la herida,
lo que demuestra que fué hecho a menos de doce pulgadas
de distancia; que el *mattress* de la cama tenía una pequeña
mancha de sangre (eso no obstante las fotografías admitidas
en evidencia demuestran que sobre el *mattress* había una
sábana tendida en la cama y no hubo prueba de que en la
sábana se encontrara mancha de sangre alguna); que la
interfecta fué colocada en la cama; que debajo del muslo
izquierdo del cadáver se encontró un revólver calibre .38 con
dos balas disparadas y dos sin disparar; que el acusado
manifestó que nunca había visto ese revólver; que a la en-
trada de la casa del acusado, al lado de la escalera, un policía
encontró una bala sin disparar calibre .38 la cual entregó
al fiscal Gerena Bras.([3])   Se probó además que se hizo la
prueba de la parafina en las manos del acusado y de la inter-
fecta y que ésta dió negativo en ambas manos de la inter-
fecta y en la derecha del acusado y positivo en la izquierda
de éste.   Hubo prueba de un testigo que trabajaba con el
acusado en Ochoa Fertilizer Corp. al efecto de que el acu-
sado, aun cuando usaba ambas manos en su trabajo, utilizaba
su mano izquierda cuando cobraba dinero a otros empleados
a quienes les había hecho préstamos y de que además, había
visto al acusado portando un revólver cuando iba a hacer

---

([3]) En la vista de la moción sobre nuevo juicio se probó que esa bala
pertenecía al fiscal Gerena Bras, a quien se le había caído de un bolsillo.

los cobros.(⁴)   Se probó que el revólver ocupado pertenecía a Nato Irlanda, inspector de Rentas Internas a quien se le perdió en el año 1943, según declaró.

La teoría de la defensa, según la expuso el juez en sus instrucciones (T.E. pág. 253), fué que "Victorina García se suicidó y que su muerte no se debió a acto alguno del acusado; que ella se suicidó con motivo de celos que tenía con el acusado".   Su prueba tendió a demostrar que Victorina siempre lo estaba celando y que había dicho, en repetidas ocasiones y la misma noche de los hechos, que iba a matar al acusado y a matarse ella; que esa noche el acusado estaba con un amigo en un *bar* y llegó Victorina a buscarlo y él le dijo que se fuera y les preparara algo de comer pues ellos irían para la casa; que luego una vecina oyó al acusado y a Victorina hablando cuando él le decía que la iba a mandar a Méjico para que se le quitaran los celos y ella le contestó que irían los dos y que entonces ella dijo: "Ahora verás como te mato a ti y después me mato yo" (pág. 195) y él le contestó: "Negra, tú no matas a nadie", y en seguida sonaron los dos disparos; que inmediatamente llegaron varios vecinos y el acusado abrió la puerta y, llorando, dijo: "Lidia se mató" (se probó que a Victorina también le decían Lidia); que a Victorina, quien estaba muerta en el piso, la colocaron en la cama y después que se la llevaron en la ambulancia fué que un policía cortó un pedazo del *mattress* que tenía una mancha de sangre.   El Sr. Fernando Badrena declaró que es jefe del acusado en la Ochoa Fertilizer Corp. desde el 1938 y que le consta que el acusado firmaba las nóminas con la mano derecha y que sabe que es derecho por la forma en que trabajaba.

De acuerdo con la teoría de la defensa y con su prueba, la muerte de Victorina se debió al acto violento y voluntario de ella, propósito que había expresado en distintas ocasiones.

---

(⁴)Dicho testigo admitió que había tenido una disputa con el acusado antes de los hechos de este caso, con motivo de una pluma que el testigo se llevó de casa del acusado.

antes de efectuarlo y aun en la misma noche en que murió, de que iba a matar al acusado y a matarse ella, y que el motivo para tal propósito, según los testigos, era que ella siempre estaba celando al acusado. Tenemos, por lo tanto, que la prueba del apelante ya había tendido a explicar el motivo que tuvo Victorina para suicidarse. Que dicha prueba pudiera o no ser creída por el jurado es cuestión que no juega papel alguno en relación con el incidente que estamos considerando. Somos de opinión que las palabras del fiscal al decirle al jurado que por qué el acusado, que era "el *único* que se encontraba en aquel cuarto con Victorina . . . *no ha explicado con su prueba* el motivo que tuvo Victorina para suicidarse", sólo podían referirse al hecho de que el acusado no había declarado en el juicio para explicar dicho motivo. Si la prueba que había presentado en su defensa ya había tratado de explicar el motivo del suicidio, ¿a qué otra prueba que no fuera la propia declaración del acusado podían referirse las palabras del fiscal? Es de notarse además que la única intervención del fiscal en el incidente fué ratificar que era "exacto" que el acusado no había explicado con su prueba lo que ella había hecho. Si el acusado era el único que estaba en el cuarto con Victorina es obvio que el fiscal se estaba refiriendo al hecho de que el acusado no había declarado en cuanto a lo que Victorina había hecho en dicho cuarto. No podía referirse a los demás testigos del caso pues ninguno presenció los hechos.

A pesar de las altamente impropias y perjudiciales palabras del fiscal, la corte no las censuró ni dió instrucciones inmediatamente al jurado para que no las tomaran en consideración.

En el caso de *Pueblo* v. *Díaz*, 69 D.P.R. 621, después de revisar extensamente la jurisprudencia aplicable a situaciones como la surgida en el presente caso, adoptamos la regla que prevalece en la mayoría de las jurisdicciones de los Estados Unidos de que "el error cometido al comentar el fiscal el

silencio del acusado queda curado *si oportunamente el juez recrimina las palabras del fiscal e instruye específicamente al jurado sobre el derecho del acusado a no ocupar la silla testifical.*" (Bastardillas nuestras.) Al adoptar esta regla, revocamos el caso de *Pueblo* v. *Roldán et al.*, 27 D.P.R. 786, y al hacerlo analizamos sus hechos, así como los que surgían de los casos en él citados, que sostenían la regla contraria. Empero, de dicho análisis surgió que en ninguno de dichos casos la corte había trasmitido instrucciones específicas inmediatamente después del comentario del fiscal al jurado sobre el silencio del acusado, ni había recriminado las palabras del fiscal. Al exponer la regla que estábamos adoptando, dijimos en el caso de *Pueblo* v. *Díaz*, a la pág. 629:

"El derecho de un acusado a no declarar y a que tal circunstancia no establezca presunción alguna en su contra no debe ser invadido por el ministerio público con comentarios adversos *ni insinuaciones de clase alguna. Si lo fuera, debe recibir del juez que presida el juicio la más severa e inmediata recriminación por conducta impropia; y el jurado ser instruído por la corte inmediatamente en forma apropiada, de suerte que en el ánimo de los juzgadores de hecho no pueda quedar vestigio alguno de tales comentarios vertidos ante ellos.*" (Bastardillas nuestras.)

En dicho caso, habiendo la corte actuado prontamente y trasmitido al jurado instrucciones específicas, ampliadas luego por las instrucciones generales, resolvimos que el error imputado había quedado subsanado.

No podemos llegar a la misma conclusión en el presente. No sólo la corte dejó de censurar las palabras del fiscal y de dar instrucciones al jurado prontamente para que no las tomaran en consideración y en esa forma subsanar el error, sino que éste tampoco fué subsanado en las instrucciones generales, ya que la corte justificó dichas palabras como un argumento lícito del fiscal, que si bien no constituía prueba, trataba de esclarecer la verdad como él mejor creía y ade-

más, erró al sostener que el comentario del fiscal no se refería al silencio del acusado.

*Debe revocarse la sentencia en el caso de asesinato y devolverse el mismo para la celebración de un nuevo juicio.*

El Juez Asociado Sr. Snyder no intervino.