EL PUEBLO DE PUERTO RICO, apelado, *v.* JOSÉ R. CALDERÓN ÁLVAREZ, acusado y apelante.

*Número:* CR-93-131 *Resuelto:* 18 de abril de 1996

*Margarita Carrillo Iturrino*, abogada del apelante; *Carlos Lugo Fiol, Procurador General Interino*, y *Ricardo Alegría Pons, Procurador General Auxiliar*, abogados de El Pueblo.

PER CURIAM: José R. Calderón Álvarez fue convicto por infracciones a los Arts. 166 (apropiación ilegal agravada) y 169 (interferencia fraudulenta con contadores o aparatos de comunicación) del Código Penal, 33 L.P.R.A. secs. 4272 y 4275, y acude en apelación de las respectivas sentencias. Según la prueba desfilada, Calderón Álvarez, quien era empleado de la Autoridad de Energía Eléctrica, colocó un imán junto al contador de la casa donde residía con el propósito de detener el mecanismo de conteo y recibir el flujo de electricidad sin pagar por ello.

## I

De la exposición narrativa de la prueba se desprende que, al momento de los hechos, el apelante Calderón Álvarez, empleado de la Autoridad de Energía Eléctrica (en

adelante la Autoridad), estaba reportado al Fondo del Seguro de Estado. La casa donde residía Calderón Álvarez, con dirección Calle Jalapa #1674, Urbanización Venus Gardens en Río Piedras, era objeto de una investigación por la Autoridad como consecuencia de una confidencia, en la cual se informó que el contador estaba intervenido de forma ilegal.[1] En diciembre de 1992, un investigador de irregularidades en el consumo de energía de la Autoridad, Carlos Rivera Cruz, recibió la encomienda de indagar sobre el asunto. Rivera Cruz tuvo que visitar la casa en tres (3) ocasiones durante días laborables, pues cada vez que acudía no encontraba a nadie. Una vez acumuló suficientes casos cuya investigación no había podido concluir, así que informó a su supervisor que iba a trabajarlos un sábado.[2] El sábado 7 de marzo de 1993 regresó a la residencia a eso de las once de la mañana, y esta vez fue recibido por el apelante Calderón Álvarez y una mujer joven. El primero accedió a que el investigador Rivera Cruz viera el contador, mas no le permitió sustituirlo por otro.

La noche del lunes 12 de marzo el investigador Rivera Cruz regresó a la casa acompañado esta vez de su supervisor Monserrate Guzmán Avilés y del policía Ricardo Caraballo Maldonado. Las luces estaban encendidas. Al acercarse al contador observaron que había un imán sujeto a éste con un alambre y que el disco del contador estaba detenido. Guzmán Avilés tomó una fotografía instantánea al contador con el imán sujeto, luego de lo cual retiraron el imán.[3]

En ese momento llamaron al interior de la residencia. Al

---

[1] La cuenta de la casa estaba a nombre de otra persona, Nilda Morales.

[2] El procedimiento regular en estas investigaciones es visitar los lugares durante días y horas laborables. Una vez se acumulan suficientes casos en que no se pudo hacer averiguaciones por no haber nadie en la residencia o el local, entonces se procede a repetir esas visitas un sábado. Testimonio de Carlos Rivera Cruz, E.N.P., pág. 11.

[3] La foto es borrosa y no es fácil distinguir lo retratado. Monserrate Guzmán Avilés sostuvo en su testimonio que fue difícil lograr una buena foto debido al ángulo en que hubo que tomarla. E.N.P., pág. 2.

recibirlos Calderón Álvarez, Guzmán Avilés le indicó el hallazgo del imán y le comunicó que tendrían que llevarse el contador y reemplazarlo con otro. Calderón Álvarez accedió y el contador fue retirado.(4) En su testimonio, el supervisor Guzmán Avilés indicó que esa misma noche preparó un expediente en el cual incluyó el contador, el imán, la foto, el sello, el informe del investigador, el número de contador y el sello que se instaló. Con posterioridad, llevó el contador al probador del laboratorio de la Autoridad donde se realizaron dos (2) pruebas conectando la pieza a una máquina especial. Una prueba se realizó con el imán y otra sin éste. En la prueba realizada sin el imán, el disco del contador tenía movimiento, mientras que en la realizada con el imán, el contador se detuvo por completo, indicativo esto de que no se registraba el consumo de electricidad.

Presentadas las acusaciones contra Calderón Álvarez, el juicio se extendió desde el 23 hasta el 31 de julio de 1993. Como prueba testifical, el Ministerio Público presentó a las personas siguientes: el supervisor Monserrate Guzmán Avilés; Carlos Rivera Cruz, investigador de la Autoridad; José Agustín Morales Roldán, oficinista de servicios técnicos y probador de contadores en la Autoridad; el policía Ricardo Caraballo Maldonado, y Carmen Iris Duprey Figueroa, empleada en la Oficina de Servicios al Consumidor de la Autoridad. La defensa, por su parte, presentó los testimonios de: el apelante Calderón Álvarez; Carmen Tirado de Rovira, Supervisora de la División de Servicios del Consumidor de la oficina de Río Piedras de la Autoridad; Pedro Aponte Meléndez, Jefe de Personal Interino de la Autoridad para noviembre de 1991; Ricardo Santos Ramos, Dirigente Obrero de la UTIER, y a Juan Castro y Héctor Hernández, como testigos de reputación.

Un panel de jurados encontró culpable a Calderón Álvarez y el tribunal de instancia dictó una sentencia que lo

---

(4) La razón principal para cambiar el contador fue que éste era marca Westinghouse y su diseño los hace susceptibles a ser afectados por un imán. E.N.P., pág. 15.

condenó a cumplir una pena de reclusión de seis (6) años por la infracción al Art. 166, *supra*, y seis (6) meses por el Art. 169, *supra*. Éstas serían cumplidas de modo concurrente.

Calderón Álvarez, quien quedó libre bajo fianza en apelación, presentó un escrito de apelación ante este Tribunal. En su alegato plantea la comisión de los seis (6) errores siguientes: (1) la admisión en evidencia del resultado de una prueba científica hecha por un empleado de la Autoridad sin que se acreditara la confiabilidad del funcionamiento de la máquina que realizó la prueba y sin haberse demostrado que la persona que hizo la prueba fuera un perito en la materia; (2) no haberse decretado la disolución del Jurado como consecuencia de unas supuestas admisiones hechas por el apelante al policía que investigó los hechos; (3) no se impartió al Jurado instrucciones especiales con respecto a alegadas manifestaciones incriminatorias hechas por el apelante, vulnerándose así los derechos a un juicio justo e imparcial y al debido proceso de ley; (4) no se permitió la presentación de prueba documental de defensa en violación al derecho constitucional a presentar prueba; (5) no se rebatió la presunción de inocencia, ni se estableció la culpabilidad del apelante más allá de toda duda razonable y, finalmente, (6) alega que no procedía su procesamiento y sentencia por las infracciones a los Arts. 166 y 169 del Código Penal, *supra*, toda vez que ambas disposiciones castigan el mismo tipo de conducta.

Por los fundamentos que se exponen a continuación, confirmamos la sentencia dictada por el hoy Tribunal de Primera Instancia, Sala Superior de San Juan.

## II

Como primer error, el apelante cuestiona la determinación del foro de instancia al admitir en evidencia el resultado de la prueba de laboratorio sin haberse acreditado el

funcionamiento de la máquina que realizó ésta y sin que se demostrara que quien realizó la prueba, el probador de la Autoridad Morales Roldán, era un perito.

■ Conviene atender primero el planteamiento relativo al testimonio de Morales Roldán. Es sabido que la cualificación para declarar como perito descansa en la posesión de un "especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente" en el área sobre la cual se habrá de testificar. Regla 53 de Evidencia, 32 L.P.R.A. Ap. IV. De otro lado, la posesión de tal cualificación por el testigo puede probarse por cualquier evidencia admisible, "incluyendo su propio testimonio". Íd.

En el caso de Morales Roldán, un examen de la exposición narrativa de la prueba muestra que éste había realizado labores en la Autoridad como instalador de contadores, celador de líneas, investigador de alto consumo y probador de contadores. Al llegar a la Autoridad en 1980 asistió a una escuela de celadores de líneas. Recibió, además, un adiestramiento en instalaciones eléctricas y sobre medidores eléctricos. Tuvo la oportunidad de tomar cursos para la reválida de perito electricista y aprobó su primera parte en abril de 1992. Sobre todo, Morales Roldán recibió un adiestramiento especial en el manejo de la máquina que prueba los contadores eléctricos y comenzó a desempeñarse como probador entre 1987 y 1988. En tal posición había realizado cerca de cinco mil (5,000) pruebas. Todo lo anterior fue suficiente para que el foro de instancia aceptara el testimonio de Morales Roldán sobre las pruebas de laboratorio que realizó. No hallamos razón alguna para alterar dicho dictamen.

En lo que respecta a la utilización de pruebas científicas en los tribunales, la Regla 82 de Evidencia, 32 L.P.R.A. Ap. IV, dispone, en sus incisos (A) y (B), lo siguiente:

(A) La admisibilidad de evidencia del resultado de un experimento o prueba científica será determinada por el tribunal de conformidad con los factores enumerados en la Regla 19. Si el

experimento tiene como fin demostrar que ciertos hechos ocurrieron de determinada manera, la parte que ofrece la evidencia debe persuadir al tribunal de que el experimento se realizó bajo circunstancias sustancialmente iguales o similares a las que existían al momento de ocurrir dichos hechos.

(B) Al estimar el valor o peso probatorio que ha de merecer una evidencia de carácter científico, el tribunal debe darle gran peso al grado de confiabilidad o certeza que la ciencia confiere al tipo de prueba en cuestión. Esto puede determinarse mediante evidencia pericial o mediante conocimiento judicial de conformidad con lo dispuesto en la Regla 11.

La admisión de pruebas científicas es materia de discreción judicial que se ejerce al amparo de los factores contenidos en la Regla 19 de Evidencia, 32 L.P.R.A. Ap. IV, a saber: el peligro de causar daño, la probabilidad de confusión, la desorientación del Jurado, la dilación de los procedimientos y la innecesaria presentación de prueba acumulativa. E.L. Chiesa Aponte, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1979, Vol. I, pág. 523. Véase, además, *Cedeño v. Tropical City Industries*, 71 D.P.R. 626, 629 (1950).

La confiabilidad de una prueba científica realizada fuera del tribunal, sin embargo, no presenta un problema de admisibilidad, sino del valor probatorio de ésta.[5] La confiabilidad de una prueba científica podrá establecerse mediante evidencia o tomando el tribunal conocimiento judicial. En el caso de autos, la confiabilidad quedó demostrada mediante el propio testimonio del técnico de la Autoridad y la presentación del resultado de las pruebas. "Los experimentos y pruebas científicas realizadas fuera del tribunal son los más comunes y se presentan en evidencia mediante el testimonio del perito que los realizó y sometiendo el resultado de las pruebas." R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, Santo Domingo, Ed. Corripio, 1994, pág. 510.

---

[5] *Cf. Pueblo v. Bianchi Álvarez*, 117 D.P.R. 484 (1986), la cuestión de si el proponente de la prueba ha demostrado una adecuada cadena de custodia se dirige al peso probatorio, materia reservada al Jurado, y no a la admisibilidad.

Morales Roldán testificó que en la prueba mecánica se conecta la máquina al contador y se le da un voltaje requerido para determinar si el contador funciona al 100% de su capacidad. La prueba se hace a través de una máquina digital que determina las revoluciones del disco.

> Según los números que dé la máquina se sacan los porcentajes con una ecuación. Hay unas tarjetas, que son tarjetas de contadores en donde se anota la información del contador que se evalúa y los resultados que se supone dé el contador y el resultado que da la máquina. El total de la ecuación es el porciento de capacidad del contador.
>
> Después de la prueba él hace un informe y se lo hace llegar a su supervisor inmediato con el informe de la prueba del contador. E.N.P., págs. 16–17.

En cuanto al funcionamiento de la máquina, al juzgador de hechos le bastó el testimonio pericial del probador. En su alegato, el apelante no nos pone en condición de precisar la ocurrencia de un abuso de discreción en dicha determinación. No se cometió el error.

## III

El apelante cuestiona que no se hubiera decretado la disolución del Jurado con motivo de unas supuestas admisiones hechas por Calderón Álvarez al policía que investigó los hechos, además de que no se impartieran al Jurado unas instrucciones especiales, vulnerándose así los derechos a un juicio justo e imparcial y al debido proceso de ley.

Nuestra Constitución es clara en señalar que "el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra". Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 308. Toda persona goza del derecho a no autoincriminarse y está cobijada por la presunción de inocencia ante una acusación por la supuesta comisión de un delito. Es por ello que previamente hemos reconocido los peligros que acarrea comentar el silencio del acusado.

> ... [C]omentar el silencio del acusado *equivale*, a todos los fines prácticos, a traer a la mente del juzgador —por aquello *"de él que calla otorga"*— prueba similar a la de una *admisión* de culpabilidad. Esto es, el *propósito infame* que persigue el *"comentario al silencio del acusado"* lo es el de convencer al juzgador de los hechos de que ese acusado —al no hablar, protestar o clamar por su inocencia, teniendo la oportunidad para hacerlo— *"admitió"*, mediante su silencio, ser responsable de los hechos que se le imputan. (Énfasis suplido y en el original.) *Pueblo v. Santiago Lugo*, 134 D.P.R. 623, 629–630 (1993).

En el pasado hemos confrontado situaciones en que durante el transcurso del juicio y en presencia del Jurado se ha comentado el silencio del acusado. *Pueblo v. Santiago Lugo*, supra; *Pueblo v. Ríos Álvarez*, 112 D.P.R. 92 (1982) (Sentencia); *Pueblo v. Esquilín París*, 98 D.P.R. 505 (1970); *Pueblo v. Perales Figueroa*, 92 D.P.R. 724 (1965); *Pueblo v. Verdejo Meléndez*, 88 D.P.R. 207 (1963); *Pueblo v. Velázquez*, 72 D.P.R. 42 (1951); *Pueblo v. Díaz*, 69 D.P.R. 621 (1949). Es menester indicar, sin embargo, que en todos esos casos los comentarios fueron realizados por el Ministerio Fiscal, de manera que nuestros pronunciamientos se han enfocado en reprender la conducta de los representantes del Estado e indicar la necesidad de que el magistrado dé instrucciones al Jurado para que despejen el efecto dañino que los comentarios pudieron tener en la mente del Jurado. Nuestras decisiones al respecto han reiterado la norma general adoptada en *Pueblo v. Díaz*, supra, pág. 629:

> El derecho de un acusado a no declarar y a que tal circunstancia no establezca presunción alguna en su contra *no debe ser invadido por el ministerio público* con comentarios adversos ni insinuaciones de clase alguna. Si lo fuera, debe recibir del juez que presida el juicio la más severa e inmediata recriminación por conducta impropia; y el jurado ser instruido por la corte inmediatamente en forma apropiada de suerte que en el ánimo de los juzgadores de hecho no pueda quedar vestigio alguno de tales comentarios vertidos ante ellos. (Énfasis suplido.)

Nuestra expresión más reciente que reitera la

norma la realizamos en *Pueblo v. Santiago Lugo*, supra, pág. 633:

> Por otro lado, y aun cuando estamos contestes con lo expuesto por el Tribunal de Apelaciones —citando al Profesor Chiesa— a los efectos de que la norma general es de que *"algún [o cualquier] tipo de comentario"* sobre el silencio del acusado necesariamente no acarrea la revocación automática de una convicción, *no puede enfatizarse lo suficiente la importancia de que los tribunales de instancia observen la norma establecida en el citado caso de Pueblo v. Díaz*, ante, esto es, que el juez inmediatamente después de ocurrido el incidente reprenda, en forma severa, al Fiscal y que, en adición, inmediatamente instruya a los señores del Jurado en forma tal que no quede en el ánimo de éstos vestigio alguno del comentario realizado; *acción correctiva judicial que no fue tomada en el presente caso.* (Énfasis suplido y en el original.)

De lo anterior pueden colegirse los componentes de la norma siguientes: (1) un deber judicial dual de reprender inmediatamente al Ministerio Público e instruir al Jurado para que descarten los comentarios, y (2) un reconocimiento de que pueden haber casos en que se hagan comentarios, mas esto no amerite una revocación.

■ Sobre la facultad de disolver el Jurado que la Regla 144 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, otorga al tribunal, tal determinación goza de gran discreción. Es norma reiterada que el juez de instancia está en mejor posición de determinar si procede o no la disolución. *Pueblo v. Guzmán Camacho*, 116 D.P.R. 34 (1984); *Pueblo v. Vélez Díaz*, 105 D.P.R. 386 (1976). Más recientemente, véase *Pueblo v. Miranda Santiago*, 130 D.P.R. 507 (1992).

En el caso del policía Caraballo Maldonado, su testimonio estaba dirigido básicamente a corroborar lo declarado por el supervisor Guzmán Avilés y el investigador Rivera Cruz, en relación con la visita que hicieron a la residencia del apelante la noche del lunes 12 de marzo de 1993. Una vez concluyó el Estado su turno en el directo, le correspondió a la defensa realizar el contrainterrogatorio. Sostiene el apelante que durante el contrainterrogatorio se comentó

el silencio del acusado, que el juez no dio instrucciones especiales al Jurado de descartar las expresiones perjudiciales y que procedía en derecho, por lo tanto, la disolución del Jurado.

El incidente en particular se suscitó cuando *la defensa* preguntó al policía Caraballo Maldonado si el apelante había negado que hubiera un imán junto al contador. A continuación transcribimos un recuento casi íntegro del intercambio entre el abogado de defensa y el testigo Caraballo Maldonado, tal como fue aceptado por las partes en la exposición narrativa de la prueba:

> Explicó que ellos llamaron por el frente de la casa y como nadie salía llamaron por la marquesina. Entonces el imputado salió por la marquesina. Cuando el imputado salió ya no estaba el imán puesto en el contador. Monserrate le explicó que habían encontrado un imán en el contador. Se le confrontó y se le preguntó si el imputado negó que él hubiera puesto el imán; el imputado dijo que sí estaba el imán. Se le preguntó si le había preguntado al imputado si él había puesto el imán; respondió que directamente no lo dijo. No dijo que lo hubiera puesto sino que Monserrate le explicó que habían encontrado un imán en el contador. Como el imputado autorizó a que se cambiara el contador el testigo entendió que había aceptado que él había puesto el imán. Se le preguntó si lo que pasó fue que el imputado no se negó a que cambiaran el contador; respondió que sí. Se le preguntó cómo fue que el imputado aceptó que él había puesto el imán; respondió que directamente no lo dijo sino que cuando Monserrate habló con él el testigo dijo "Conmigo no hay problemas, estaba ese imán allí, pues, chévere".

> Se le dijo a qué se refería cuando declaraba que el imputado hizo una admisión indirecta de los hechos. Se le preguntó si con ello se refería a que el imputado abriera el portón y dijera que no tenía objeción a que chequearan el contador. Respondió que ellos le explicaron y él no protestó y estaba tranquilo. Se le preguntó si el hecho de que estuviera tranquilo, no lo negó, era una admisión de los hechos. Dijo que no se opuso. Se le preguntó si cuando se sometieron los cargos si el imputado fue en la patrulla el imputado le dijo que era víctima de persecución en la AEE. Dijo que no recordaba. E.N.P., págs. 20–22.

Debemos comenzar señalando que lo que pareció en un

momento una admisión, en realidad constituyó un comentario al silencio del acusado. Sin embargo, distinto de los casos citados previamente, en éste no es el Ministerio Público quien hace la manifestación. El comentario se produce durante el contrainterrogatorio dirigido por la defensa a un testigo de cargo. Es el testigo Caraballo quien hace la declaración *a instancias de la pregunta que formula la representación legal del apelante Calderón Álvarez*. No está presente un ardid y menos una componenda por parte del Ministerio Público para perjudicar al acusado. Si bien reconocemos la deseabilidad de que el tribunal dé instrucciones ante cualquier manifestación del silencio del acusado, esto, sin importar de dónde ella provenga, la misma, visto todo el incidente en su contexto, no creemos que éste haya dejado una mella tal en la mente del Jurado que les impidiera llegar a un dictamen justo.[6] No estamos ante la "patente intensidad y magnitud" del comentario presente en *Pueblo v. Santiago Lugo*, supra.

Recordemos que aun cuando pudiera entenderse que el no haber impartido instrucciones fue un error constitucional por parte del magistrado, todavía resta ver si éste fue de carácter perjudicial. No todo error que afecte derechos constitucionales acarrea una revocación. Es, sin embargo, deber de la parte que se benefició del error demostrar, más allá de duda razonable, que el error en la admisión no fue perjudicial. *Pueblo v. Pellot Pérez*, 121 D.P.R. 791, 803–804 (1988). En este caso la prueba de cargo no descansaba únicamente en el testimonio del policía Caraballo Maldonado. Además de él, el Ministerio Público presentó el testimonio de dos (2) oficiales de la Autoridad que declararon haber visto el imán atado al contador de la residencia del apelante y un probador de la Autoridad que testificó sobre los efectos del imán incautado en el con-

---

[6] La defensa no solicitó instrucciones en ese momento ni en la etapa de instrucciones finales al Jurado.

tador del apelante. Una vez el juzgador de los hechos le ha brindado credibilidad a estos testimonios, este foro apelativo debe reconocer esa prueba como suficiente para sostener el dictamen como justo.

Por último, en lo que respecta a la posibilidad de que el tribunal hubiera disuelto el Jurado, ya mencionamos que merece gran deferencia la decisión a la que haya llegado el foro de instancia. Éste se encontraba en mejor posición que nosotros para aquilatar el perjuicio que el testimonio de Caraballo Maldonado, uno de corroboración, pudo tener en el ánimo del Jurado. No intervendremos con su apreciación.

No se cometieron ninguno de los dos (2) errores señalados.

## IV

El cuarto error versa sobre la negativa del tribunal a aceptar la presentación de una prueba documental por parte de la defensa, debido a que ésta no había sido notificada al Ministerio Público durante la etapa del descubrimiento de prueba.

▆▆▆▆ Mientras el descubrimiento de prueba a favor del acusado es un imperativo constitucional, *Pueblo v. Rodríguez Sánchez*, 109 D.P.R. 243 (1979), el descubrimiento a favor del Ministerio Fiscal es un requerimiento de naturaleza estatutaria. El esquema previsto por el legislador en las Reglas 95 y 95A de Procedimiento Criminal, 34 L.P.R.A. Ap. II, crea un deber recíproco de descubrir prueba y ese posee tres (3) aspectos medulares pertinentes a la controversia de autos.

El primero es que el descubrimiento a favor del Ministerio Fiscal exige que la defensa haya hecho una solicitud previa de descubrimiento a su favor. Esto es, la Regla 95A de Procedimiento Criminal, *supra*, hace mandatorio que la defensa "reciproque" el descubrimiento que el Estado hace

a favor del acusado. El segundo aspecto es que el alcance del descubrimiento que la defensa está obligada a realizar es limitado y se circunscribe en términos generales a objetos, documentos, resultados de exámenes físicos o mentales, y pruebas o experimentos científicos. Por último, bajo la citada Regla 95A, contrario al caso de la Regla 95 de Procedimiento Criminal, *supra*, el descubrimiento de prueba a favor del Ministerio Fiscal está limitado a la prueba que esté en manos de la defensa. Al respecto señala el comentarista Chiesa lo siguiente:

> El segundo requisito —que la evidencia solicitada esté en posición, control o custodia del acusado— tal como quedó aprobada la regla, es favorable a la defensa cuando se compara con el descubrimiento solicitado por el acusado. Bajo la Regla 95(c), cuando la evidencia solicitada por la defensa no se halla en posesión, custodia o control del Ministerio Fiscal, éste debe así informarlo al Tribunal, que ordenará a la persona o entidad correspondiente a que ponga la evidencia a disposición del acusado. Bajo la Regla 95–A, no se provee para que el Tribunal ordene a la persona o entidad que tiene control de la evidencia solicitada por el Ministerio Público, que la ponga a su disposición. El resultado parece ser que el Ministerio Fiscal no obtendría el descubrimiento, por lo que la "reciprocidad" no es completa. E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1993, Vol. III, Cap. 28, Sec. 28.2, pág. 339.

La representación legal del apelante intentó presentar una carta enviada por el Lcdo. Jesús Hernández Sánchez, abogado de Calderón Álvarez, al Lcdo. Rubén Portugués, jefe de personal en la Autoridad. No surge con claridad del expediente la naturaleza de esta comunicación. La presentación de la misiva se trató de hacer en el turno de interrogatorio de Pedro Aponte Meléndez, quien fungía como jefe interino de personal de la Autoridad para noviembre de 1991 y quien tuvo que contestar la carta al licenciado Hernández Sánchez. Al momento de testificar en el juicio, este testigo tenía consigo el expediente personal del apelante en la Autoridad, el cual contenía la susodicha carta. El Ministerio Público cuestionó la admisibilidad de la carta por ser

ella una prueba de referencia y no haber sido notificada por la defensa en el descubrimiento de prueba realizado según la Regla 95A de Procedimiento Criminal, *supra*. El tribunal acogió el planteamiento y denegó la admisión de la carta, aunque sí ordenó que se marcara como prueba ofrecida. Admitió, en cambio, la carta que el testigo Aponte Meléndez envió como contestación al licenciado Hernández Sánchez.

Mientras el Ministerio Fiscal hace hincapié en su alegato en cuanto a que el texto claro de la Regla 95A de Procedimiento Criminal, *supra*, es indicativo de que la defensa debió producir la carta durante la etapa de descubrimiento de prueba, el apelante esboza dos (2) puntos. Por un lado, sostiene que la citada Regla 95A, en cuanto a que obliga al acusado a producir prueba en su defensa, es inconstitucional. Además, alega que al momento de hacer el Ministerio Fiscal la solicitud al amparo de la referida Regla 95A, todavía la defensa no tenía conocimiento de que iba a utilizar la carta en cuestión.

Un examen del asunto nos lleva a concluir que el tribunal de instancia erró al no admitir la carta bajo el fundamento de que la defensa debió haberla producido según dispone la Regla 95A de Procedimiento Criminal, *supra*. Como ya indicamos, para que el acusado esté en la obligación de revelar una prueba al Ministerio Fiscal, la regla exige que dicha prueba esté bajo la custodia o posesión del acusado. En el caso de autos, la carta *no estaba en posesión* de la defensa. Ella era parte del expediente del apelante en la Autoridad y se trataba, por lo tanto, de una prueba no susceptible de ser reclamada al amparo de la Regla 95A, *supra*. No obstante, lo anterior no dispone del presente error. La carta en cuestión constituía una declaración realizada por una persona fuera del juicio. En caso de que ella haya sido ofrecida en evidencia como prueba de la verdad de lo aseverado, estaríamos ante una prueba de referencia;

la cual, como regla general, no es admisible. Reglas 60 y 61 de Evidencia, 32 L.P.R.A. Ap. IV.

En este caso el apelante no nos pone en condición de determinar que la carta no constituía una prueba de referencia o que su presentación estaba cobijada por alguna de las excepciones a la regla de exclusión. Más allá de alegar que "se trataba de prueba fundamental a la teoría del caso" (Alegato del apelante, pág. 32), en ningún momento ha expuesto cuál fue la naturaleza y el propósito de la carta. En esas circunstancias, aunque amparados en razones distintas a las del tribunal de instancia, concluimos que la carta era inadmisible.

## V

Alega el apelante que su culpabilidad no se probó más allá de duda razonable. Es norma reiterada que, bajo nuestro ordenamiento constitucional, la determinación de culpabilidad de una persona depende de que sean probados los elementos del delito imputado y su conexión con el acusado más allá de duda razonable. *Pueblo v. González Román*, 138 D.P.R. 691 (1995); *Pueblo v. Rivero, Lugo y Almodóvar*, 121 D.P.R. 454 (1988). Hemos examinado la exposición narrativa de la prueba certificada como correcta por el tribunal de instancia. Los testimonios de Guzmán Avilés, de Rivera Cruz y de Caraballo Maldonado coinciden en describir cómo los tres (3) encontraron un imán atado al contador de la residencia del apelante. El probador de la Autoridad también testificó que el imán tenía el efecto de detener el conteo del contador. No existe fundamento suficiente en el expediente para diferir de la apreciación que de los hechos hizo el Jurado. Si bien las determinaciones de hecho del Jurado no son infalibles, este Tribunal siempre ha respetado el principio bajo el cual se le concede gran deferencia a la apreciación del tribunal de instancia. *Pue-*

*blo v. Cabán Torres*, 117 D.P.R. 645 (1986). El apelante se apropió, de forma ilegal y no violenta, de energía eléctrica propiedad del Estado. Art. 166 del Código Penal, *supra.* Para ello y con el objetivo fraudulento de obtener el servicio, alteró e interfirió un contador de energía eléctrica. Art. 169 del Código Penal, *supra.* A la luz de lo anterior, concluimos que la prueba creída en el tribunal de instancia por el Jurado satisface los elementos constitutivos de los delitos imputados. En ausencia en este caso de pasión, prejuicio o error manifiesto, el más justo proceder en esta etapa apelativa es la confirmación de la sentencia dictada. El error no se cometió.

## VI

Como último error, el apelante cuestiona la validez de su procesamiento y sentencia por los dos (2) delitos, violación a los Arts. 166 y 169 del Código Penal, *supra*, toda vez que ambas disposiciones castigan el mismo tipo de conducta. Alega que la relación entre los delitos mencionados es una de especialidad y que sólo podía ser enjuiciado y condenado por el delito especial. Veamos.

 El principio de especialidad está incorporado en nuestro derecho penal a través del Art. 5 del Código Penal, 33 L.P.R.A. sec. 3005: "Si la misma materia fuera prevista por una ley o disposición especial y por una ley o disposición de carácter general, se aplicará la ley especial en cuanto no se establezca lo contrario". Cuando el artículo habla de *la misma materia* no se refiere al simple hecho de que dos (2) tipos penales sean de aplicación a la misma conducta. Se requiere una relación entre un delito general y uno especial, "donde el delito especial contiene elementos adicionales no incluidos en el general, que requiera la aplicación de la ley especial". *Pueblo v. Pérez Casillas*, 117 D.P.R. 380, 399 (1986). El penalista Jiménez de Asúa describe el principio en los términos siguientes:

Se dice que dos leyes o dos disposiciones legales se hallan en relación de general y especial, cuando los requisitos del tipo general están todos contenidos en el especial, en el que figuran además otras condiciones calificativas a virtud de las cuales la ley especial tiene preferencia sobre la general en su aplicación. L. Jiménez de Asúa, *La ley y el delito*, 5ta ed., Buenos Aires, Ed. Sudamericana, 1967, pág. 146.

Ese no es el caso de los dos (2) delitos por los cuales el apelante fue procesado y convicto. El Art. 165 del Código Penal, 33 L.P.R.A. sec. 4271, dispone, en lo pertinente, que el delito de apropiación ilegal se configura cuando una persona "ilegalmente se apropi[a] sin violencia ni intimidación de bienes muebles, pertenecientes a otra persona". Respecto al término *bienes muebles*, éste comprende energía eléctrica. Véase Art. 7(8) del Código Penal, 33 L.P.R.A. sec. 3022(8). En el caso del citado Art. 166, éste dispone como modalidad agravada del delito de apropiación ilegal, el que la persona se apropie "de bienes o fondos públicos pertenecientes al Gobierno del Estado Libre Asociado de Puerto Rico, los municipios, agencias, corporaciones públicas, subdivisiones políticas y demás dependencias públicas o a entidades privadas de beneficencia". Para este delito la pena fija es de diez (10) años, que podrá ser aumentada a doce (12) con agravantes o reducirse a seis (6) con atenuantes. En el caso de autos, a Calderón Álvarez se le impuso el mínimo de seis (6) años.

El Art. 169, *supra*, por su parte, trata del delito de interferencia con contadores o aparatos de comunicación:

Toda persona que con el propósito de perjudicar o defraudar, establezca una conexión directa, altere, interfiera, obstruya el medidor o contador de agua, gas, electricidad u otro fluido, o cualquier aparato de comunicación, [teléfono,] o utilice cualquier otro medio o subterfugio para obtener fraudulentamente dichos servicios, será sancionada con pena de reclusión por un término máximo de seis meses o multa máxima de quinientos dólares o ambas penas a discreción del tribunal.

Mientras un delito atiende la apropiación de bienes estatales, el otro prohíbe la intervención fraudulenta con el

flujo de servicios tales como agua y electricidad. Si bien la conducta del apelante configuró ambos delitos, la naturaleza de éstos es diferente. En fin, no se trata de "la misma materia", por lo que tampoco erró el tribunal de instancia a este respecto.

A pesar de lo anterior, un examen de los dos (2) delitos por los cuales fue procesado y sentenciado el apelante arroja una relación de "concurso de delitos" entre ellos. El Art. 63 del Código Penal, 33 L.P.R.A. sec. 3321, dispone que "un acto u omisión penable de distintos modos por diferentes disposiciones penales, podrá castigarse con arreglo a cualquiera de dichas disposiciones pero en ningún caso bajo más de una". En este caso estamos ante una sola conducta de Calderón Álvarez que infringe dos (2) disposiciones penales. El "acto" es punible por el Art. 166, *supra*, en tanto el bien apropiado —energía eléctrica— es propiedad del Estado, así como por el Art. 169, *supra*, por haberse realizado la apropiación mediante la interferencia fraudulenta de un contador. En tal caso, aun cuando fue legítimo procesar a Calderón Álvarez por los dos (2) delitos, no se le puede castigar por ambos. Procede aplicar el principio bajo el cual el delito mayor subsume al menor y, por consiguiente, se anula la pena impuesta de seis (6) meses de reclusión por el citado Art. 169. La convicción, en cambio, subsiste. *Pueblo v. Meléndez Cartagena*, 106 D.P.R. 338, 347 (1977); *Pueblo v. De la Cruz*, 106 D.P.R. 378, 386 (1977).

En vista de las razones antes expuestas, se modifica la sentencia apelada para anular la condena impuesta por el delito de interferencia con contadores o aparatos de comunicación, sosteniendo la pena por el delito de apropiación ilegal agravada.

*Se dictará la sentencia correspondiente.*