TEXTO COMPLETO DE LA SENTENCIA
Comparece ante nos, el acusado-apelante, Héctor M. Morales Ortiz. Solicita que revoquemos cinco sentencias dictadas en su contra el 11 de octubre de 2001, por el Tribunal de Primera Instancia, Sala de Carolina (Hon. Bernardo Colón Barbosa, Juez). En las referidas sentencias se declaró culpable a Morales Ortiz de los delitos de asesinato en primer grado (Artículos 82 y 83 del Código Penal, 33 L.P.R.A. secs. 4001 y 4002); infracciones a los Artículos 6 y 8 de la Ley de Armas (25 L.P.R.A. secs. 416 y 418, respectivamente), e infracciones a los Artículos 95 y 239-A del Código Penal (33 L.P.R.A. secs. 4032 y 4435a, respectivamente). Por los fundamentos que expondremos a continuación, se confirman las sentencias apeladas.
I
El 30 de agosto de 2001, Héctor M. Morales Ortiz fue declarado culpable por tribunal de derecho de haber cometido los delitos de asesinato en primer grado (Caso Crim. NSCR200100197); infracción al Artículo 6 de la Ley de Armas (Caso Crim. NSCR200100195); infracción al Artículo 8 de la Ley de Armas (Caso Crim. NSCR200100196); infracción al Artículo 239-A del Código Penal (Caso Crim. NSCR200100198); e infracción al Artículo 95 del Código Penal (Caso Crim. NSCR200100199). El 11 de octubre de 2001, el Tribunal de Primera Instancia, Sala de Carolina, dictó sentencia en cada uno de los cargos antes indicados. Por el delito de asesinato en primer grado impuso una pena de 99 años de prisión y el pago de una pena especial; cuatro y cinco años de prisión por las infracciones a los Artículos 6 y 8 de la Ley de Armas respectivamente; 3 años de prisión por la infracción al Artículo 239-A del Código Penal; y 3 años de prisión, más el pago de una pena especial por la infracción al Artículo 95 del Código Penal. Las penas fueron impuestas para cumplirse concurrentemente.
No conforme con lo resuelto por el Tribunal de Primera Instancia, Morales Ortiz acude ante nos mediante recurso de apelación. En síntesis, alega que el Tribunal de Primera Instancia cometió error manifiesto en la apreciación de la prueba, la cual según él es indigna de crédito y está plagada de contradicciones sustanciales. También alega que el Ministerio Público no logró probar su culpabilidad más allá de duda razonable.
Contando con los alegatos del acusado-apelante Morales Ortiz y del Procurador General, con el beneficio de la exposición narrativa estipulada de la prueba y de los autos originales de los diversos cargos impuestos, resolvemos.
II
La prueba de cargo en este caso contó con los testimonios de Milagros Rivera Fuentes, Lourdes Martínez Santiago y de la Agente Luz F. Romero. Por otro lado, las partes estipularon las declaraciones juradas prestadas *1109 por Carmen Minerva Montalvo y Francisco Javier Diaz Rosario. Según se desprende en el escrito de apelación, las partes también estipularon el testimonio de Orlando Ríos Rivera, hermano del occiso, a los efectos de que identificó el cadáver de la víctima en el Instituto de Ciencias Forenses.
Del testimonio de Milagros Rivera Fuentes (la señora madre de la víctima), se desprende que el 2 de junio de 1998, ella se sentó como a eso de las 11:00 p.m. a ver las noticias en la sala, y que al rato escuchó un silbido por dos ocasiones. Luego escuchó que llamaron a su hijo por el nombre de “Afro” y fue a la cocina a decirle a éste que lo estaban llamando. Su hijo, cuyo verdadero nombre era Roberto Carlos Ríos Rivera, salió afuera para hablar con la persona que lo estaba llamando. Su hijo Roberto vestía un pantalón corto de color azul y no tenía camisa.
La testigo continuó declarando que su nietecito se le fue detrás a su hijo Roberto, por lo que ella salió “para coger el nene y meterlo hacia adentro”. Declaró también que cuando ella salió a buscar al niño, Roberto le preguntó si se acordaba de la persona que estaba hablando con él y ella miró. Declaró acto seguido que Roberto nuevamente le preguntó si se acordaba de la persona y que dicha persona volteó la cara y ella no lo podía ver.
A preguntas del Fiscal, la testigo Milagros Rivera Fuentes testificó que la refeiida persona era más baja que su hijo (quien medía 5'11) y que se veía “anchita”, aunque no sabía sí era por la ropa que tenía puesta. E.N.P., a la pág. 2. Testificó que la persona tenía un suéter ancho y oscuro.
Al preguntársele si recordaba algo más sobre la persona que estaba hablando con su hijo, la testigo Milagros Rivera Fuentes contestó que no recordaba mucho porque “la persona no miraba hacia donde ella estaba”. E.N. P., a la pág. 2. Testificó también que le dijo a su hijo que no se acordaba de la persona que hablaba con él.
Dicha testigo declaró además que “ella cogió al nene y se fue a la casa” y que no escuchó la conversación entre su hijo y el individuo. E.N.P., a la pág. 3. La testigo declaró que su hijo se quedó un rato más afuera, luego entró a su cuarto y ella le preguntó que para dónde iba. El le contestó que iba a salir un momento y que regresaba rápido.
Roberto “se fue con el muchacho” y caminaron hacia la Carretera número 3. E.N.P., a la pág. 3. Al ella llamar a su hijo “para que se pusiera una camisa”, la persona que lo acompañaba le dijo que “eso es rápido”. E. N.P., a la pág. 3. Se fueron caminando en dirección hacia la primera casa. La testigo explicó que la casa de ella es la número 18 y los hechos ocurrieron en casa de Carmen Montalvo, que es la casa número 1. Dijo también que para llegar a la carretera número 3, hay que pasar por la casa de Carmen Montalvo.
La testigo declaró que fue a cambiarse de ropa y luego se sentó en la sala a ver televisión y a esperar a su hijo, y que “al tiempo, bien rápido”, llegó un auto con dos muchachos, uno de ellos llamado Andresito. E.N.P., a la pág. 3. Estos muchachos andaban en un auto “como un cinco litros” y le dan la noticia de que a su hijo lo habían matado. Id. Testificó que fue hasta el lugar de los hechos y que vio a su hijo “tirado en el piso boca abajo”, frente a la casa de Carmen. Id. Dijo que la cabeza de su hijo daba hacia la carretera y que tenía puesto el pantalón azul que tenía cuando salió de la casa, chancletas y que no tenía camisa.
Durante el contrainterrogatorio, la testigo Milagrós Rivera Fuentes declaró que ni el agente Bonilla ni la agente Romero la llevaron a una rueda de confrontación o a una rueda de confrontación “para identificar voz”. E.N.P., a la pág. 4. Declaró nuevamente que “no vio de frente al individuo porque él no le dio el frente a ella”. Id. A preguntas de si ella estuvo conversando frente a frente con la persona, respondió que “hablando como tal, no”. Id.
A preguntas de si fue rápido el episodio de ella salir, buscar su nieto y responderle las preguntas de su hijo, la testigo contestó que sí. Estimó como en diez o quince minutos el tiempo que su hijo estuvo hablando afuera *1110 con el individuo. Al preguntársele a la testigo si cuando ella salió a decirle a su hijo que se pusiera una camisa vio algún vehículo, respondió que “no sabía porque su mente estaba en salir”. E.N.P., a la pág. 5. Estimó que su hijo salió con el individuo “a eso de las 11:45 p.m”. E.N.P., a la pág. 6.
El segundo testimonio lo brindó Lourdes Martínez Santiago, quien a la fecha de los hechos vivía con sus tres hijos y el acusado-apelante, Morales Ortiz. Declaró esta testigo que el acusado-apelante, Morales Ortiz, fue su compañero consensual y convivieron casi dos años.
Testificó Martínez Santiago que para junio de 1998, el acusado-apelante (Morales Ortiz, alias “Pito”) recibió una llamada a un. celular entre las 10:30 y 11:00 p.m. Declaró que al recibir la llamada, “Pito” le preguntó a la persona que lo llamó que si se encontraba bien, “que si pasaba algo”. E.N.P., a la pág. 7. El (“Pito”) le dijo a la testigo que iba a salir, a lo que ella le respondió que “él no podía salir porque el carro que estaba ajuera era el de ella” (un Hyundai Accent blanco del año 1997). E.N.P., a la pág. 7. Martínez Santiago testificó que le dijo a “Pito” que se iba con él, cosa que hizo junto a sus tres hijos, quienes en aquel momento tenían siete, seis y cinco años.
Declaró esta testigo que se dirigieron hacia la Carretera Núm. 3, en dirección a Luquillo y se percató de que “un carro los iba siguiendo”. E.N.P., a la pág. 7. Dijo la testigo que se dirigieron a la Urbanización Brisas del Mar, conocida también como Luquillo Mar. Continuó relatando la testigo que “viraron a la izquierda y luego en la primera bocacalle a la derecha y llegaron a una residencia que estaba a la izquierda y viraron ahí en'U' ”. Id. Testificó que entonces “Pito” se estacionó con el vehículo en dirección a la carretera número 3. Martínez Santiago también declaró que “ella se quedó en el carro ” y que “Pito” vestía un “pantalón corto y tenía puesto un jacket por juera cuyo color no recordaba”. Id. Luego dijo que el color del jacket “era azul’. Id.
Testificó además que desde la acera, “Pito” llamó a una persona y cuando llamó, salió “una persona de la casa con una señora mayor”. Id. Dijo que el muchacho que salió de la casa era alto, no pasaba de 18 a 20 años y era más alto que “Pitó”.
Continuó relatando esta testigo que “Pito se puso a hablar con el muchacho” y que no tardaron más de cinco minutos en la conversación. Id. Declaró también que “la señora se fue para la casa ” y que “Pitó” y el muchacho “se fueron caminando por la acera hacia abajo, en dirección a la número 3”. Id. Testificó que “Pito iba detrás del muchacho y como en la tercera residencia le dio el primer impacto con una pistola por la espalda”. Id.
Indicó la testigo que “Pito hizo la detonación y el muchacho sale corriendo” y que “Pitó” salió corriendo detrás del muchacho. E.N.P., a la pág. 8. La testigo declaró también que “Pito” tenía un arma de fuego en la mano, aunque no la podía describir y no sabía en qué mano tenía el arma. Relató la testigo que “luego de que el muchacho corre y Pito corre detrás de él, escuchó unas detonaciones ”. Id. La testigo no pudo precisar cuántas detonaciones fueron. E.N.P., a la pág. 8.
Declaró que en “un momento dejó de ver a Pito y al muchacho ”. Explicó que los dejó de ver cuando llegan a la última casa. Id. Aclaró la testigo que la calle por donde corrían tiene una curva y que desde donde ella estaba en el vehículo no podía ver lo último.
Como parte de su testimonio de los hechos, Martínez Santiago declaró que “cuando terminaron las detonaciones, Pito venía caminando bastante rápido hacia el carro”. Id. Dijo también que vio el carro oscuro que los estaba siguiendo, a mano derecha, en la parte de arriba de la calle donde ella estaba estacionada.
Continuó relatando esta testigo que Pito se montó en el carro y a preguntas de ella de porqué había hecho eso, él le contestó que “había unas personas que tenían que ver lo que él había hecho”. Id. La testigo dijo que *1111 cuando “Pito” se montó en el carro pudo ver el arma, pero no la pudo describir.
La testigo relató también que al marcharse del lugar, vio al muchacho que salió de la casa, en la acera, y una puerta blanca manchada de sangre. Relató, por otro lado, que Pito le dijo “que si ella hablaba en algún momento, sus nenes y ella se iban juntos, que los iban a matar”. E.N.P., a la pág. 9. Declaró que no habló de estos hechos hasta el 15 de septiembre de 2000, “porque estaba amenazada y vivía con él” (“Pito”). Id.
Durante el contrainterrogatorio, a preguntas de si habían llegado a Luquillo Mar a las 10:45, Martínez Santiago contestó que sí. Respondió también que estaba segura de que “estaban afuera conversandoj,] Pito, el muchacho y la señora”. Id. Respondió también que nunca vio un niño allí.
Por otro lado, la testigo declaró que ella estaba en el asiento del pasajero y los niños iban en la parte de atrás; que estaba pegada a la acera y que cuando “Pito hablaba con el muchacho y la señora”, ella estaba como a “cinco o seis pies de distancia de ellos”. E.N.P., a la pág. 10.
De la exposición narrativa de la prueba se desprende que a la testigo se le hicieron una serie de preguntas con relación a la descripción del arma. Se deduce de la referida exposición que la testigo se acordaba de la descripción del arma al momento de la vista preliminar, pero no así para la fecha del juicio. La testigo contestó, además, que después del último señalamiento del caso se le olvidó la descripción del arma que había dado antes.
Declaró también la testigo Martínez Santiago que vio cuando se le hizo la primera detonación al occiso y no vio las otras detonaciones. En el re-directo, dijo que llegaron al lugar de 10:45 a 11:00 p.m. aproximadamente.
Respondió, por último, esta testigo, que en la vista preliminar dijo que el arma era niquelada y que ella prestó declaración jurada dos años después de los hechos, por lo que hay detalles que se le pueden haber olvidado. Dijo también que “son muchos los nervios”. E.N.P., a la pág. 11.
La última testigo de cargo lo fue la agente Luz F. Romero. Relató los testimonios que le brindaron Carmen Minerva Montalvo y su esposo, Francisco Javier. Estas personas son los residentes de la casa CC-1, frente a la cual sucedieron los hechos. Relató también el testimonio que le hizo la señora Milagros Rivera Fuentes, madre del occiso. También testificó que entrevistó a varios vecinos de la calle.
Continuó relatando la agente Romero que una de las armas que se le ocupó a un tal “Abraham Dones” dio positivo con uno de los casquillos o fragmentos de la autopsia de Roberto Carlos Ríos Rivera, el occiso. Dijo no saber cuánto tiempo “Dones” tuvo el arma en su posesión. Según la agente Romero, el agente Bonilla, quien fue el primero en investigar el caso, le comentó que en el lugar se habían levantado catorce casquillos de balas disparadas. Dicho agente le comentó que halló casquillos desde el poste frente a la casa CC-3 hasta la residencia CC-1 había casquillos.
La agente también testificó que entrevistó a Lourdes Martínez Santiago entre agosto y septiembre de 2000. La agente relató el testimonio que dio esa testigo. La agente también relató los pormenores del examen ocular que hizo en compañía de la testigo Martínez Santiago.
Sobre algunos aspectos específicos del testimonio de la testigo Lourdes Martínez Santiago, la agente Romero declaró lo siguiente, y citamos:

“La casa que Lourdes identificó como el lugar en donde vio a Afro en el piso coincide con la escena en que se levantó el cadáver. Lo que Lourdes le dijo que Afro era más alto que Pito coincide porque Afro medía unos 
*1112
5'10 y Pito mide unos 5'7. Lourdes le dijo que Afro estaba sin camisa y así se ve en las fotos que Bonilla tomó. ”

E.N.P., a la pág. 15.
Sobre la persona a la que se le ocupó el arma, es decir, Abraham Torres o Abraham Dones, la agente testificó que “no es más bajito que 'Afro'”. E.N.P., a la pág. 15. De acuerdo a la agente, el testimonio de la madre del occiso coincide en que “ella vio la noche de los hechos a un muchacho más bajito que 'Afro', quien medía 5'10”. Id. La agente Romero declaró que el acusado-apelante, Morales Ortiz, mide 57 y Abraham Dones mide 5"10.
La agente Romero explicó que la Avenida A es bastante amplia y que desde la casa CC-18 se puede ver hasta la casa CC-9, aproximadamente. Dijo que no se puede ver hacia la casa CC-1 porque la avenida se convierte en una curva. E.N.P., a la pág. 16.
Durante el contrainterrogatorio, la agente Romero declaró que se le ocuparon dos armas a Abraham Torres Dones, de las cuales una resultó compatible con los proyectiles que se ocuparon en la escena (una Rugger .9 mm.). La agente también testificó que en su informe preparado en septiembre de 2000, consignó que el arma. utilizada para quitarle la vida al occiso fue una pistola niquelada. Al preguntársele de donde había obtenido esa información, contestó que de Lourdes [Martínez'Santiago], Dijo la agente que tuvo conocimiento del arma cuando leyó los resultados del informe de Ciencias Forenses, casi al empezar el juicio.
A preguntas sobre la descripción de Abraham Torres Dones, la agente declaró que nunca lo ha visto y que según los expedientes medía 5 "10.
De acuerdo al testimonio de la agente Romero, “la mayor parte de los casquillos se ocuparon en la vía de rodaje frente a la casa de Minerva, en la casa de Minerva.y se ocuparon cuatro o cinco casquillos al otro extremo de la avenida”. E.N.P., a la pág. 18.
En el redirecto, se le preguntó a la agente Romero si de acuerdo a preguntas de la defensa ella tenía versiones que no concuerdan en cuanto a la hora. Respondió que sí y explicó que en su experiencia como investigadora de aproximadamente 27 años, las versiones de testigos en cuanto a la hora exacta de unos hechos no concuerdan con exactitud. Dijo que “puede haber diferencia en cuanto a la memoria de las personas sobre los hechos”. E.N.P., a la pág. 20.
Sobre la inspección del lugar que la agente Romero hizo con la testigo Lourdes [Martínez Santiago] declaró que “desde donde estaba el vehículo estacionado se podían apreciar las personas mayores de edad, pero no se podía apreciar un menor porque hay una verja bastante alta que impide que desde el interior de un vehículo se pueda ver a un niño pequeño ”. Id.
Testificó que realizó las entrevistas más de un año después de los hechos. Declaró también la agente Romero que: “para ella, los impactos recibidos por el occiso eran compatibles con la versión de Lourdes [Martínez Santiago] porque ella dijo que iban andando juntos, de cerca. El occiso tenía impactos de bala en la espalda y en otras partes del cuerpo ”. Id.
Por otro lado, la agente Romero declaró que las versiones de la madre del occiso con la de Lourdes [Martínez Santiago] eran compatibles con que en cierto momento, en la noche de los hechos, estaban los tres (la madre, “Pito” y el occiso) afuera por corto tiempo. Id.
Por último, la testigo agente Romero declaró que recibió los resultados de balística poco antes de empezar *1113 el juicio y que Lourdes Martínez Santiago le dijo inicialmente que era una pistola niquelada. Del informe de balística surge que el arma usada para los hechos era una pistola negra, pero que para ella “lo más importante es el resultado de balística y no el color del arma”. E.N.P., a la pág. 21.
Como parte de la pmeba a presentarse en el juicio, se estipularon las declaraciones juradas de Carmen Minerva Montalvo y Francisco Javier Díaz Rosario. En síntesis, Montalvo declaró que el 2 de junio de 1998, se encontraba con su familia en el cine y salieron hacia su casa (Calle A CC-1 Urb. Luquillo Mar) como a las 11:30 p.m., y llegaron como en unos cinco minutos. Estando dentro de su casa (preparando chocolate, café y galletas), sintió una balacera y recibió impactos de bala en cada una de sus piernas. Declaró que su esposo salió del cuarto y se percató de que había un muchacho muerto afuera. Mientras se encontraba en el hospital, la policía la entrevistó y le tomaron varios retratos.
Francisco Javier Díaz Rosario, esposo de Montalvo, declaró también que salió del cine a eso de las 11.30 p. m. y llegó a su casa como en unos diez a quince minutos. Declaró sobre la balacera que se sintió frente a su casa, la cual hirió a su esposa en ambas piernas. Declaró también que la persona tirada en el suelo tenía puesto un pantalón corto, no tenía camisa y era de tez trigueña. Declaró también sobre el trámite de llevar a su esposa al hospital luego del incidente.
III
El Artículo II, Sección 11, de la Constitución de Puerto Rico consagra la presunción de inocencia como uno de los derechos fundamentales que asiste a todo acusado. Por ello, la Regla 110 de Procedimiento Criminal dispone que “[e]n todo procedimiento criminal, se presumirá inocente al acusado mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad se le absolverá... ”.
Es por esta razón que el Ministerio Público deberá presentar prueba que establezca más allá de duda razonable todos los elementos del delito y su vínculo con el acusado. Todo ello es necesario para obtener una convicción válida que supere la presunción de inocencia del acusado. Pueblo v. Calderón Alvárez, 140 D.P.R. 627 (1996); Pueblo v. Collado, 140 D.P.R. 107 (1996); Pueblo v. González Román, 138 D.P.R. 691(1995).
El mandato constitucional que garantiza al acusado la presunción de inocencia, exige que toda convicción esté sostenida por evidencia que “además de suficiente, [sea] satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Esa insatisfacción con la prueba es lo que se conoce como duda razonable y fundada”. Pueblo v. Feliciano Rodríguez, Opinión de 29 de febrero de 2000, 2000 J.T.S. 47. Véase también, Pueblo v. Rivero Diodonet, 121 D.P.R. 454 (1988).
Sin embargo, lo anterior no significa “que toda duda posible, especulativa o imaginaria tenga que ser destruida a los fines de establecer la culpabilidad del acusado con certeza matemática. Sólo se exige que la prueba establezca aquella certeza moral que convence, dirige la inteligencia y satisface la razón. ” Pueblo v. Rosario Reyes, 138 D.P.R. 591, 598 (1995). Véase además, Pueblo v. Pagán, Ortiz, 130 D.P.R. 470, 480 (1992); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 760-761 (1985).
Al evaluar si se probó la culpabilidad del acusado más allá de duda razonable, los tribunales apelativos concederán gran deferencia al juzgador de primera instancia. Pueblo v. Rodríguez Román, 128 D.P.R. 121, 131 (1991). Ello obedece a que el juzgador de los hechos es quien, de ordinario, está en mejor posición para aquilatar la prueba testifical, ya que fue él quien oyó y vio declarar a los testigos. Pueblo v. Bonilla Romero, 120 D.P.R. 92 (1987); Pueblo v. Cabán Torres, 117 D.P.R. 645, 654 (1986).
De otra parte, el Tribunal Supremo ha resuelto reiteradamente que “basta la evidencia directa de un testigo que le merezca al juzgador entero crédito para probar cualquier hecho, salvo, claro está, que por ley se disponga otra cosa”. Regla 10(d) de Evidencia, 32 L.P.R.A. Ap. IV; Pueblo v. Chévere Heredia, 139 D.P.R. 1, *1114 15; Pueblo v. Rodríguez Román, supra; Pueblo v. Acevedo Quiñones, 100 D.P.R. 894, 899 (1972).
Por otro lado, es norma reiterada que el sólo hecho de que existan contradicciones en las declaraciones de un testigo, no justifica que se rechace dicha declaración en su totalidad si las contradicciones no son decisivas y si el resto del testimonio es suficiente para establecer la transacción delictiva, superar la presunción de inocencia y establecer la culpabilidad más allá de duda razonable. No debe resolverse un caso por aquellos detalles que no van a la médula de la controversia. Pueblo v. Falcón Negrón, 126 D.P.R. 75, 80 (1990); Pueblo v. Ramos y Alvarez, 122 D.P.R. 287 (1988); Pueblo v. Mattei Torres, 121 D.P.R. 600 (1988); Pueblo v. Feliciano Hernández, 113 D.P.R. 371 (1982).
Cuando un testigo se contradice, lo que se pone en juego es su credibilidad. Es al jurado o al juez de instancia a quien le corresponde resolver el valor de su testimonio restante. Pueblo v. Cruz Negrón, 104 D.P.R. 881 (1976). “Sabido es que la máxima falsus in uno, falsus in ómnibus, no autoriza a rechazar toda la declaración de un testigo porque se haya contradicho o faltado a la verdad respecto a uno o más particulares. En otras palabras, es imprescindible armonizar toda la prueba y analizarla en conjunto a los fines de arribar al peso que ha de concedérsele a la prueba en su totalidad”. Pueblo v. Rodríguez Román, a la pág. 129. Véase también, Pueblo v. Cruz Negrón, supra, a la pág. 883 (1976); Pueblo v. López Rivera, 102 D.P.R. 359, 366 (1974).
Es norma reiterada que los jueces de instancia y los jurados son quienes están en mejor posición de aquilatar la prueba. Pueblo v. Falcón Negrón, supra, a la pág. 79; Pueblo v. Miranda Ortiz, 117 D.P.R. 188, 191 (1986). Por lo tanto, no se intervendrá en la apreciación de la prueba que haga el jurado en ausencia de error manifiesto, prejuicio, parcialidad o pasión. Pueblo v. Irizarry Irizarry, Opinión de 10 de mayo de 2002, 2002 J.T.S. 68; Pueblo v. Maysonave, 129 D.P.R. 49 (1991); Pueblo v. Lebrón González, 113 D.P.R. 81, 105 (1982). Sólo ante la presencia de esos elementos o cuando la apreciación de la prueba no concuerde con la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal revisor habrá de intervenir con la apreciación efectuada. Pueblo v. Irizarry Irizarry, supra, a la pág. 1110.
No obstante, los tribunales apelativos no deben vacilar en dejar sin efecto un fallo inculpatorio cuando el resultado del análisis del caso deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado. Pueblo v. Irizarry Irizarry, supra, a la pág. 1110; Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R 545, 551 (1974). La doctrina de deferencia no es sinónimo de que el tribunal de apelación hará prevalecer un fallo de culpabilidad aunque esté convencido de que un análisis integral de la prueba no establece la culpabilidad más allá de duda razonable. Pueblo v. Irizarry Irizarry, supra, a la pág. 1110.
IV
El acusado-apelante, Morales Ortiz, alega que la prueba de cargo fue de “dudosa credibilidad’, ya que las versiones de las principales testigos se contradicen ente sí. Escrito de Apelación, a la pág. 13.
En primer lugar, el acusado-apelante, Morales Ortiz, argumenta que la madre del occiso, Rivera Fuentes, declaró durante la entrevista con la agente-investigadora que su hijo le insistió en que ella mirara el físico de la persona; que ella no le puso atención a eso y que la persona decía “deja eso, deja eso”. E.N.P., a la pág. 12. Nos dice el acusado-apelante que esa declaración es contradictoria con el testimonio durante el juicio, cuando Rivera Fuentes declaró que su hijo le preguntó en dos ocasiones si se acordaba de la persona que estaba hablando con él. Entendemos que la supuesta contradicción no tiene el peso sustancial que le atribuye el acusado-apelante, Morales Ortiz. Lo cierto es que de ambas declaraciones se deduce claramente el interés que tenía el occiso en que su madre se fijara o mirara a la persona que conversaba con él. Si la testigo expresó ese hecho de diferentes formas, no vemos entonces en dónde radica la supuesta contradicción. Por otro lado, y aun suponiendo que hay contradicción, la misma era un asunto de credibilidad que, junto a la totalidad del testimonio, tenía que ser sopesado en este caso por el tribunal de derecho.
*1115 Por otro lado, el acusado-apelante' Morales Ortiz señala como contradictorio que la testigo Rivera Fuentes declaró que no se fijó en el individuo porque éste le volteó la cara, y después dijo en el contrainterrogatorio que el individuo le evadía la mirada. Aduce el acusado-apelante Morales Ortiz que si esto último fuera lo correcto la testigo hubiese podido apreciar los rasgos físicos del individuo. Escrito de Apelación, a la pág. 14. Sin embargo, esa contradicción alegada no surge de la Exposición Narrativa Estipulada de la Prueba. De hecho, durante el contrainterrogatorio, esta testigo se reafirmó en que “no vio de frente al individuo porque él no le dio el frente a ella”. E.N.P., a la pág. 5. A todas luces el testimonio es consistente en ese aspecto.
Otro argumento del acusado-apelante Morales Ortiz es que la testigo Rivera Fuentes fue contradicha cuando declaró que su nieto salió afuera detrás de su hijo. Dice que la testigo Lourdes Martínez Santiago dijo no haber visto ningún niño allí. Esta supuesta contradicción fue explicada por la agente Romero cuando declaró que según su inspección ocular, en el lugar hay una verja bastante alta que impide ver a un menor desde el interior de un vehículo. Como vemos, no hay razón para catalogar como increíble o imposible el testimonio de Rivera Fuentes sobre este aspecto, máxime cuando el tribunal sentenciador tuvo la oportunidad de adjudicarle la credibilidad que estimara pertinente.
Acto seguido, el acusado-apelante Morales Ortiz argumenta que hay contradicción en los testimonios de las testigos principales en otro aspecto importante. Como vimos, Martínez Santiago declaró que vio a Rivera Fuentes hablando cara a cara con el acusado-apelante Morales Ortiz, y por su parte, Rivera Fuentes declaró que nunca habló con el individuo que fue a buscar a su hijo. A pesar de que esto puede parecer una contradicción, los testimonios sí concuerdan en que en un momento dado hubo tres personas fuera de la casa, es decir, la testigo Rivera Fuentes, su hijo Roberto (apodado Afro) y el individuo que lo llamó desde fuera de la casa. Este asunto es otra cuestión de credibilidad, que el juzgador de primera instancia tuvo la obligación de dirimir y darle el peso probatorio que entendiera adecuado. Recuérdese además que la testigo Lourdes Martínez Santiago brindó declaración jurada por primera vez, dos años después de los hechos y esa sola contradicción con el testimonio de Rivera Fuentes no es óbice para restarle completo valor a su testimonio. Por el contrario, es una contradicción natural y comprensible, dado el tiempo transcurrido.
Otro hecho de importancia, según el acusado-apeiante Morales Ortiz es que la madre del occiso no escuchó ningún disparo. Esto lo deduce el acusado-apelante, ya que a través de la exposición narrativa no se desprende que la testigo haya declarado categóricamente que no escuchó algún disparo. Sobre este asunto, coincidimos con el Procurador General cuando nos dice que Rivera Fuentes declaró que cuando su hijo salió, lo llamó para que se pusiera una camisa y luego ella fue a su cuarto a cambiarse de ropa. No nos resulta increíble o totalmente improbable que esta testigo, en esas circunstancias, no haya escuchado el primer disparo o los disparos subsiguientes que resultaron en la muerte de su hijo frente a la casa de los Montalvo, la cual queda retirada de su residencia.
Por otro lado, el acusado-apelante, Morales Ortiz, argumenta que la testigo Rivera Fuentes declaró que al salir de la casa no vio ningún carro u otra persona, a pesar de que la testigo Martínez Santiago declaró que estaba estacionada en un carro blanco cerca de la residencia de Rivera Fuentes. Tampoco vemos que esta supuesta contradicción tenga efectos en menoscabar completamente la credibilidad que la testigo Rivera Fuentes le pudiera merecer al tribunal sentenciador. No es increíble o improbable que una persona pueda estar distraída o pendiente de otras cosas y como consecuericia de ello no se fije en un carro estacionado frente a su casa..
En cuanto al testimonio de Lourdes Martínez Santiago, el acusado-apelante Morales Ortiz alega que también está lleno de inconsistencias y contradicciones. Específicamente, el acusado-apelante Morales Ortiz alega que esta testigo declaró que el occiso salió de sq casa y luego se marchó con Morales Ortiz, a pesar de que la otra testigo declaró que su hijo entró a la casa y luego volvió a salir. Esta supuesta contradicción no la consideramos de vital importancia, máxime cuando de ambos testimonios se desprende que el occiso sí salió *1116 caminando de su casa junto a la persona que lo llamó desde afuera. Esa persona fue identificada posteriormente por la testigo Martínez Santiago como el aquí acusado-apelante, Morales Ortiz.
Este último alega también que la testigo Martínez Santiago incurrió en contradicciones al narrar lo que sucedió después del primer disparo. Al tribunal sentenciador obviamente le mereció entera credibilidad el testimonio de Martínez Santiago en el sentido de que vio cuando el acusado-apelante le disparó por la espalda a Roberto (el occiso); que vio cuando Roberto salió corriendo y el acusado-apelante Morales Ortiz se le fue corriendo detrás; que después de eso escuchó unas detonaciones y qué luego de las mismas vio al acusado-apelante, Morales Ortiz, alias “Pito”, caminar bastante rápido hasta el carro; que “Pito” le dijo a la testigo que había unas personas que tenían que ver lo que él había hecho; y que la amenazó de muerte a ella y a sus hijos si la testigo hablaba sobre lo sucedido.
Por último, el acusado-apelante, Morales Ortiz, alega que es increíble que la testigo declarara en vista preliminar que el arma era niquelada y luego dijera que no Se recordaba del color del arma. Esta alegada contradicción u olvido tampoco nos parece decisivo para echar por tierra todo el testimonio de esta testigo, la cual declaró dos años después de ocurridos los hechos y el tribunal entendió probado que estuvo amenazada de muerte si hablaba sobre lo que observó. Esa discrepancia u olvido no altera el hecho creído por el tribunal en el sentido de que se utilizó un arma de fuego para darle muerte al occiso Roberto Carlos Ríos Rivera, alias “Afro”.
La testigo Martínez Santiago le mereció credibilidad al tribunal, por lo que en ausencia de prueba de que el tribunal sentenciador actuó con pasión, prejuicio o parcialidad, nos vemos impedidos de cuestionar ésa apreciación.
Al examinar la totalidad de la prueba testifical que tuvo ante sí el juzgador de hechos, notamos que los testimonios concuerdan en muchos aspectos fundamentales, aparte de que una testigo ocular, creída por el tribunal, estableció los elementos del delito y su conexión con el acusado-apelante, Morales Ortiz. Las supuestas contradicciones señaladas por el acusado-apelante no se pueden catalogar como decisivas. Un análisis integral del resto de los testimonios demuestra que éstos fueron suficientes para superar la presunción de inocencia y establecer la culpabilidad del acusado más allá de duda razonable. El acusado-apelante, Morales Ortiz, no ha expuesto nada que nos mueva a intervenir con esa apreciación del Tribunal de Primera Instancia, por lo que confirmamos las sentencias apeladas.
y
Por los fundamentos expuestos a continuación, confirmamos las sentencias apeladas.
Lo acordó y ordena el Tribunal y lo certifica la Secretaria General.
Aida Ileana Oquendo Graulau Secretaria General