TEXTO COMPLETO DE LA SENTENCIA
El 15 de junio de 2005 se presentó ante este Tribunal el recurso de epígrafe. Se recurre de una resolución *356 del Tribunal de Primera Instancia, Sala de Mayagüez, que se negó a excluir el resultado de la prueba de concentración de alcohol en la sangre realizada al peticionario, toda vez que la misma fue hecha, según se alega, en contravención con lo dispuesto por el reglamento aprobado por el Departamento de Salud. Evaluado el recurso y la documentación que se acompaña a la luz del estado de derecho vigente, procedemos a resolver.
I
El peticionario de epígrafe fue denunciado por conducir un vehículo de motor bajo efecto de bebidas embriagantes, conducta tipificada en el Artículo 7.02 de la Ley Núm. 22 de 7 de enero de 2000 mejor conocida como la Ley de Vehículos y Tránsito de Puerto Rico. Oportunamente su representación legal presentó una moción en solicitud de descubrimiento de prueba. El fiscal proveyó los documentos solicitados, entre éstos proveyó copia de la Hoja de Cotejo de Calibración de Instrumentos Para Medir Concentración de Alcohol en la Sangre a través del Aliento. A base de la información provista, la defensa del recurrente presentó una moción solicitando la supresión de la evidencia ocupada consistente la misma en la determinación de la prueba de embriaguez. Expuso que de la referida hoja de cotejo surgía que la máquina Intoxilyzer 5000 fue la utilizada para efectuar el análisis físico de prueba de aliento para determinar la concentración de alcohol en la sangre. Que la fecha de preparación de la fórmula utilizada para calibrar la máquina data de varios meses antes de la fecha de la intervención. Que ello está en contravención con lo dispuesto en los Artículos 8.24 y 8.25 del Reglamento Número 110 del Departamento de Salud que específicamente dispone que la solución de alcohol etílico y agua destilada a ser utilizada para la calibración de la máquina será preparada todos los meses, cambiando de un mes a otro la calibración de la misma. Que por ello procede la supresión de toda la evidencia.
Examinados los escritos sometidos por ambas partes, el Tribunal aquí recurrido denegó la supresión solicitada. Mediante una fundamentada resolución y al analizar las disposiciones del Reglamento alegadamente incumplidas, dicho foro señaló:

“El inciso (g) del Artículo 7.09 de la Ley 22 del 7 de enero de 2000, 9 L.P.R.A. 5209(g), autoriza al Secretario del Departamento de Salud a reglamentar el manejo de los instrumentos científicos utilizados para la determinación de la concentración de alcohol en el cuerpo de los conductores. Entre estos instrumentos que deben ser objeto de reglamentación se encuentra el Intoxilyzer Modelo 5000. ”

Alega la defensa que la máquina Intoxilyzer 5000 utilizada para efectuar el análisis físico de la prueba de aliento para determinar la concentración de alcohol en la sangre del acusado de epígrafe no fue calibrada por el Departamento de Salud conforme al Reglamento 110 aprobado el 14 de septiembre de 2001, ya que se utilizó una solución que no fue preparada el mes de abril de 2004 en que se calibró la máquina y se intervino con el acusado, sino que se preparó varios meses antes de su calibración. Los Artículos 8.24 y 8.25 de dicho reglamento establece que:

“8.24 Por lo menos una vez en cada mes natural, los químicos o tecnólogos médicos del Departamento de Salud, verificarán la calibración de los instrumentos y llevarán un récord para ello.

8.25 Para el cotejo de la calibración utilizarán una solución de alcohol etílico en agua destilada, (concentración conocida), y un simulador diseñado y aprobado para tal propósito. La solución será preparada todos los meses cambiando de un mes a otro la concentración de la misma.

Nótese que estos artículos no indican quién preparará la concentración, pero son claros al efecto que la calibración tiene que hacerse utilizando soluciones con concentraciones de alcohol distintas cada mes. Alega el Ministerio Público que actualmente los químicos del Departamento de Salud están utilizando una solución con vigencia de un año, que el Departamento compra hecha a la misma compañía que fabrica el Intoxilyzer y el simulador, lo que garantiza una verificación exacta y sin riesgo, según lo requiere el Artículo 8.24 del Reglamento. El reglamento dispone además en su Artículo 9.01 que: “La adopción de nuevas técnicas de 
*357
análisis o nuevos instrumentos cualificados, se hará en forma administrativa cobijado por las disposiciones de la Ley de Vehículos y Tránsito de Puerto Rico y este Reglamento, sin necesidad de que sean radicadas en el Departamento de Estado como disposiciones reglamentarias.

Los Artículos 8.24 y 8.25 establecen unas guías para efectuar el cotejo de la calibración de la máquina con el propósito de garantizar que la misma esté funcionando adecuadamente y que los resultados obtenidos de las pruebas en ella realizadas sean unos certeros y confiables. Por tratarse de unas guías o instrucciones operacionales, el incumplimiento de las mismas no hace de la lectura del instrumento una ilegal. Trata, pues, de un asunto de confiabilidad de resultados de una prueba científica el cual no presenta un asunto de exclusión, sino del valor probatorio de ésta. La admisión de pruebas científicas es materia de discreción judicial que se ejerce al amparo de los factores contenidos en la Regla 19. La confiabilidad de una prueba científica puede establecerse mediante evidencia o tomando conocimiento judicial, ver Pueblo v. Calderón Álvarez, 140 D.P.R. 627. El Tribunal Supremo de Puerto Rico ha resuelto que cualquier infracción a un reglamento no puede constituir defensa para el acusado a menos que demuestre un verdadero error que pueda cambiar el resultado del análisis, ver Pueblo v. Echevarría, 87 D.P.R. 208. ” (Énfasis nuestro).
II
La Ley de Vehículos y Tránsito de Puerto Rico, enmendada en el año 2000, supra, establece los procedimientos y penalidades para el delito de conducir vehículos de motor bajo los efectos de bebidas embriagantes, drogas o sustancias controladas. De conformidad con lo dispuesto en el Artículo 7.09(g) de dicha ley, el Secretario de Salud estará autorizado para reglamentar la forma y sitio en que habrán de tomarse, envasarse, analizarse las muestras y otros procedimientos a fines de análisis químico. Cónsono con esta facultad, la ley autoriza al Secretario de Salud a adoptar y reglamentar el uso de los instrumentos científicos que estime necesarios para determinar la concentración de alcohol en la sangre de los conductores detenidos. Dicha facultad de ley se extiende al instrumento que utibzará el agente del orden público para hacer la prueba inicial del aliento. A esos fines, el Departamento de Salud aprobó en el año 2000 el Reglamento Número 110 aquí en controversia. En el mismo, y en lo pertinente, se dispone en su Sección 4.25 que “el análisis de una muestra de aliento de un individuo, se hará utilizando un instrumento analítico para la determinación de niveles de alcohol en la sangre por medio del análisis de alcohol en el aliento. A esos fines, el Secretario de Salud adoptó el instrumento conocido como “Intoxilyzer, Modelo 5000 EN” para realizar el análisis de aliento a los conductores. Con el propósito de indicar la forma de operación del referido Intoxilyzer, el Secretario adoptó un “Manual de Procedimientos”.
-A-
Naturaleza y Operación del Instrumento.
El Intoxilyzer 5000 EN es fabricado por la compañía EMI Incorporated en Kentucky y está diseñado-para determinar concentración alcohólica a través del aliento. El mismo usa una técnica-conocida como absorción infrarroja. La fuente de luz que emite el Intoxilyzer 5000 EN, está compuesta por un filamento de tungsteno y halógeno.
La luz que pasa a través de la cámara del Intoxilyzer 5000 EN, es enviada a un procesador .electrónico, el cual tiene cinco (5) lentes, los cuales están compuestos de un material llamado cuarzo.
El largo del paso de luz se concentra dentro de la cámara. Cada molécula absorbe luz de un largo de onda específico, dependiendo del tamaño físico estructural de la misma. Basado en este hecho, el Intoxilyzer 5000 EN mide el grado de absorción de energía infrarroja por parte del alcohol en la cámara del instrumento. Esta medida se traduce eventualmente en la concentración del alcohol en la sangre del individuo.
El equipo para verificar la calibración del intoxímetro, lo es el simulador de aliento con alcohol o equipo *358 similar. Se utiliza en las pruebas de corroboración de la calibración de los instrumentos, por los químicos del laboratorio “Toxicología de Alcohol”, y el personal técnico de la Policía de Puerto Rico, mensualmente en cada lugar donde están ubicados.
Los químicos preparan la solución del simulador, una vez al mes con agua destilada y alcohol absoluto, o sustancias que sean requeridas para que lea predeterminado resultado, la misma lleva un número de control o código que simplifique la identificación sin que se repita.
Los artefactos para la prueba de aliento son usados por los agentes de la policía estatal, designados por el superintendente y debidamente cualificados para tal propósito por el Secretario de Salud.
La operación y uso del intoxímetro estará a cargo del personal de la Policía de Puerto Rico, debidamente adiestrados por dicha Agencia u otra fuente acreditada. Estos serán certificados por el Secretario de Salud. Véase Manual de Procedimientos del Intoxilyzer 5000 EN.
El mantenimiento preventivo y técnico se realiza por miembros de la policía o personal cualificado por el fabricante, debidamente cualificados y certificados por el Secretario de Salud.
-B-
Controversia
La controversia sobre la cual se centra el argumento del peticionario, gira en torno al hecho de que la solución utilizada para la calibración del Intoxilyzer 5000 fue “preparada varios meses antes de la realización del proceso de calibración de la misma”, lo que, ajuicio de los recurrentes, viola la siguiente disposición del Reglamento:

“8.25 Para el cotejo de calibración utilizarán una solución de alcohol etílico en agua destilada, (concentración conocida), y un simulador diseñado y aprobado para tal propósito. La solución será preparada todos los meses cambiando de un mes a otro la concentración de la misma. ”

¿Constituye ese alegado incumplimiento un asunto de exclusión de prueba o de valor probatorio de la misma?
Varios tribunales de los Estados Unidos han tenido oportunidad de pronunciarse sobre esta interrogante al enfrentarse a argumentos similares. Específicamente, argumentos en cuanto a la no admisibilidad por no cumplirse con los requisitos de calibración.
En el caso de United States v. Loren K. McMillan, 820 F.2d 251 (1987), la Corte de Apelaciones para el Octavo Circuito al confirmar una resolución de la Corte de Distrito Federal para el Distrito de Dakota del Sur que denegó una moción de supresión de evidencia expresó:

“McMillan argues that the trial court erred in denying his motion to suppress evidence of the results of the Intoxilyzer test, contending that the test was not performed in conformity with South Dakota law and regulations. McMillan relies on S.D.C.L. (sec.) 32-23-14.1 (1984) which provides in part: ‘To be considered valid under the provisions of this chapter, the chemical test analysis of the person’s breath shall have been performed according to methods approved by the state chemist and by individual possessing a valid permit issued by the state chemist for this purpose’. See also State v. Richards, 378 N.W. 2d 259, 261 & n.1 (S.D. 1985) (discussing the “prima facie evidence" the state must produce before Intoxilyzer results are admissible).

A representative of the South Dakota state chemist testified at the hearing on the motion to suppress and at 
*359
trial that the methods approved by the state chemist include monthly calibration of the Intoxilyzer, immediate repair in the event of machine malfunction, and the presence of a witness to the administration of the Intoxilyzer ■ test. McMillan contends that the evidence showed that these procedures were not followed in this case. The district court denied McMillan’s motion to suppress, stating that these objections went to the weight rather than the admissibility of the evidence.

The district court did not err in denying McMillan’s motion to suppress. In a federal criminal proceeding, ' the admissibility of evidence is governed by federal standards. (Citas omitidas).

We agree with the district court that McMillan’s objections to the procedures employed in the administration of the Intoxilyzer went to the weight of the evidence. ”

De igual forma, en el caso de Commonwealth of Kentucky v. Chad Davis, 25 S.W. 3d 106 (2000), el . Tribunal expresó:

“The Intoxilyzer test results should be admitted into evidence, and any problems with the simulator component of the device should go to the weight of such evidence, rather than its admissibility, when the calibration unit and testing unit are in proper working order on the testing date. Previous shortcomings should so to the weisht of the evidence only”.

Por su paite, en el caso de State of Montana v. Jeffrey Kevin O'Brian, 770 P. 2d 507 (1989), como parte de la discusión del caso, la Corte Suprema de Montana expuso:

“Further, the testimony at trial sufficiently explained the reason for the low calibration checks on May 26, 1987 and the lack of effect such low readings would have had on the accuracy of the appellant’s breath tests. As Newhouse testified, the low calibration readings of 0.060 and 0.062 on May 26, 1987 were due to a general . decrease in the alcohol concentration of the simulator solution because of its repeated use over the prior four to five month period.

The Crime Lab instructed all officers operating the Intoxilyzer 5000 to change the simulator solution once a month to prevent this decrease in the solution’s alcohol concentration, but the officers failed to do so.

Consequently, many calibration checks such as the ones run on May 26, 1987 proved essentially worthless because of the unknown alcohol concentration of the simulator solution. However, these invalid calibration checks had no bearing on the validity of the defendant’s breath test for, as stated by Newhouse, ‘calibration checks are entirely independent of the breath tests. ‘The low calibration readings thus were not indicative of a faulty instrument, but only of a gradually diminished alcohol content in the simulator solution. We therefore hold that the District Court did not err in holding that the Intoxilyzer 5000 test was administered in substantial compliance with the Administrative Rules of Montana.” (Énfasis nuestro).
El alcance real del procedimiento rutinario de calibración se explica con prístina claridad en el artículo redactado por Gil Sapir & Mark Giangrande titulado “Right to inspect and test breath alcohol machines: suspicion ain’t Proof publicado en “The John Marshall Law School”, 33 J. Marshall L. Rev. 1, (1999).

“Calibration is a mechanical tune-up that returns the unit to operational specifications-nothing more. The breath alcohol machine’s accuracy is dependent on inherent design limitations. The fact that a machine functions mechanically does not mean that the machine provides accurate results. Furthermore, the court cannot take judicial notice of an industrial tolerance of 0.10% for recertification of equipment. The equipment’s design and tolerances are independent of appropriate calibration procedures, maintenance, and the use. Therefore, an expert witness is necessary to establish the accuracy of the machine, to rely upon theory of 
*360
“industrial tolerance ”, and present other scientific issues.

The mere fact a breath alcohol machine is periodically examined and certified through its recertification process does not authenticate the reliability and credibility of its contents. The degree to which adjustments are made and parts are changed or repaired can render the value of test results between calibrations suspect. A statement of calibration following repairs and adjustments on the breath alcohol machine is not an adequate demonstration of prior accuracy and operability of the machine. Furthermore, ‘records [can be] in error, and they deserve no special presumption of credibility as compared to opposing testimony of a witness.

Most state legislatures or state administrative agencies have defined alcohol as ethanol or ethyl alcohol. The breath alcohol machine is calibrated within a range to react only to ethanol. Yet, calibration merely means that the machine is within tolerance specifications as defined by the manufacturer. This does not mean that the machine can accurately detect a level of ethanol exclusively, or that it cannot react in the presence of other alchohol-like compounds that may also be present. Therefore, claiming the calibrated breath alcohol machine is ‘accurate’, ‘calibrated accurate’, or ‘certified accurate’ is a misnomer. Misinformation regarding the breath alcohol machine is worse than no information at all. Accuracy of the machine is independent of calibration. The mechanical readjustment of the breath alcohol machine (calibration) cannot compensate or change its inherent design limitations (accuracy). ”

III
Al examinar el señalamiento de error invocado por el peticionario a la luz del estado de derecho expuesto, vemos que el mismo se dirige a atacar el valor probatorio de la prueba y no la admisibilidad de la prueba de alcohol. En su moción solicitando supresión de evidencia, el abogado del peticionario expuso que la evidencia debe ser excluida por entender que “su valor probatorio es dudoso y no compensa el riesgo de perjuicio indebido”. (Moción para que se decrete inadmisibilidad de prueba, pág. 3).
Por otro lado, en su recurso ante nosotros, sostiene que “no se trata de valor probatorio, sino de admisibilidad”. (Pág. 7 del escrito de certiorari).
Ciertamente, los Artículos 8.24 y 8.25 del Reglamento citados por la defensa disponen que la calibración se verificará una vez en cada mes y que la solución se preparará todos los meses y se cambiará de mes a mes.
Sin embargo, el Artículo 9.01 del Reglamento en controversia dispone expresamente que “la adopción de nuevas técnicas de análisis o nuevos instrumentos cualificados, se hará en forma administrativa [...] sin necesidad de que sean radicadas en el Departamento de Estado como disposiciones reglamentarias.” Por lo tanto, aunque deseable, no es requisito mandatorio que el Departamento de Salud enmiende el Reglamento 6346 cada vez que el manufacturero de la solución utibzada para calibrar el instrumento determine variar el tipo de solución a ser utilizada para cahbrar el instrumento.
Por otro lado, no existe una protección constitucional o estatutaria que exija determinada solución para calibrar un instrumento utilizado para realizar pruebas de concentración de alcohol en la sangre. Así parece reconocerlo el peticionario al no hacer alegación al respecto. Ni la actual Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 22 de 7 de enero de 2000, ni la antigua Ley de Vehículos y Tránsito de Puerto Rico, Ley Núm. 141 de 20 de julio de 1960, disponen para la utilización de determinado tipo de solución como requisito previo de admisibilidad de las pruebas de aliento. Por el contrario, ambas leyes le han conferido amplia discreción al Secretario de Salud para reglamentar la forma y sitio en que se tomarán, envasarán y analizarán las muestras de cualquier sustancia del cuerpo, así como para “adoptar y reglamentar el uso de los instrumentos científicos que estimare necesarios para determinar la concentración de alcohol en la sangre. ” Véanse, Artículo 7.09(g) de la Ley Núm. 22, 9 L.P.R.A. §5209(g); y Sección 5-803(d) de la antigua Ley Núm. 141, 9 L.P.R.A. § 1043(d).
En el caso de epígrafe, se cumplieron con todos los requisitos que impone la Ley Núm. 22. A saber, se le *361 entregó al acusado-peticionario una copia del resultado del análisis químico del aliento antes del juicio y se le suministró a la representación legal de éste mediante el descubrimiento de prueba realizado, información completa sobre los análisis de aliento practicados. Véase, Artículo 7.09(k), 9 L.P.R.A. §5209(k). Así las cosas, los requisitos adicionales impuestos por el Secretario de Salud sólo comprendían un ejercicio de la discreción conferida por la Ley de Vehículos y Tránsito de Puerto Rico.
El Reglamento aquí en controversia fue aprobado por el Secretario de Salud con el fin de delimitar el proceso de la toma de muestras de sangre y aliento y otros procedimientos afines con el análisis químico para determinar el porciento de concentración alcohólica en el cuerpo de una persona. Asimismo, el Artículo 8.24 instruye para que se realice el mantenimiento preventivo de los instrumentos utilizados para pruebas de aliento, como el “Intoxilyzer”, por los químicos o tecnólogos médicos del Departamento de Salud. Dicho mantenimiento, como antes hemos expuesto, incluye la calibración de la máquina utilizando una solución preparada todos los meses y un simulador diseñado y aprobado para tales propósitos. Véase, Artículo 8.25 del Reglamento 6346. Sin embargo, la variación, por determinación del manufacturero, del tipo de solución a ser utilizada para calibrar la máquina, no implica que el proceso haya sido realizado de forma ilegal o inconstitucional, por lo que no se justificaría la supresión automática sugerida por los peticionarios. El Reglamento no dispone para que se suprima o se invalide el resultado de una prueba de aliento en aquellos casos en que se incumpla con el requisito de que la solución sea preparada todos los meses.
En síntesis, el alegado incumplimiento con el requisito reglamentario dispuesto en el Artículo 8.25 del Reglamento 6346 no propende al reconocimiento de una regla de exclusión automática. Los requisitos contenidos en dicho Reglamento no tienen el efecto de crear parámetros de admisibilidad evidenciaría adicionales a los que establecen las Reglas de Evidencia. El uso de una solución con una fecha de vigencia distinta a aquella establecida mediante la aprobación del Reglamento 6346, a lo sumo, conlleva el incumplimiento de un aspecto del reglamento. En estas circunstancias, el remedio reclamado por el peticionario sencillamente no estaría disponible. El incumplimiento de alguna disposición reglamentaria en el ámbito administrativo podría, en casos extremos, conllevar la invalidación de la actuación administrativa; nunca la supresión de evidencia en un caso criminal. No existe conducta alguna realizada por agentes del Estado que infrinja los derechos constitucionales del peticionario. Por lo tanto, no es aplicable la regla de exclusión de evidencia dispuesta en nuestra Constitución. Cf. Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).
Los fundamentos esbozados por el aquí peticionario a los fines de excluir la evidencia en el caso de autos no se basan en la regla de exclusión de evidencia ilegalmente obtenida. Por el contrario, su objetivo es atacar la confiabilidad de una evidencia demostrativa, claramente pertinente y admisible, mediante alegaciones relacionadas con la inobservancia de varios requisitos reglamentarios.
No estamos ante una solicitud de supresión de evidencia producto de un registro ilegal, que debe dilucidarse antes del juicio, como lo exige la Regla 234 de las Reglas de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 234. En esencia, la admisibilidad de los resultados de las pruebas de aliento realizadas al peticionario es un asunto de “pertinencia condicionada” que debe ser dilucidado por el Tribunal recurrido según lo dispuesto por las Reglas 9(B) y 75 de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV, R. 9(B) y 75. Esa determinación se hace en el juicio, por razón de que se trata, fundamentalmente, de una cuestión de hechos que debe dirimir el juzgador de hechos. No se trata de aplicar una regla de exclusión de evidencia fundada en consideraciones de “policy”, como ocurre en el caso de evidencia producto de un registro ilegal, que deba ser adjudicada antes del juicio. Tampoco se trata de regla de exclusión fundada en cuestiones de derecho, como una admisión o confesión obtenida en violación a las normas de Miranda. Ese tipo de supresión se dilucida bajo la Regla 9 (A) de Evidencia y la resuelve exclusivamente el juez. Sin embargo, la situación bajo la Regla 9(B) [3] de las Reglas de Evidencia es distinta.
En ese sentido, el profesor Chiesa explica el concepto de “pertinencia condicionada”, el cual se rige por la *362 Regla 9(B) de las Reglas de Evidencia, de la siguiente forma:

“A diferencia de objeciones a la admisibilidad de evidencia basadas en una regla de exclusión, hay situaciones en que se objeta a la admisibilidad de evidencia a base de que su pertinencia depende de un hecho que no ha sido establecido. A esto se le llama pertinencia condicional (“conditional relevance”) a diferencia de problemas de pertinencia lógica, como la pertinencia de la huida de la escena como evidencia circunstancial de responsabilidad. Se dice que las determinaciones de hechos de las que depende la admisibilidad de evidencia en el caso de pertinencia condicional, son del tipo que el jurado está acostumbrado a hacer: ¿firmó el demandado la carta o contrato que se ofrece en su contra?; ¿dijo fulano tal cosa y la escuchó zutano?, etc. ”

En el comentario del Comité Asesor a la Regla Federal 104(b) se explica así la diferencia entre pertinencia condicionada y pertinencia lógica:

“In some situations, the relevancy of an item of evidence, in the large sense, depends upon the existence of a particular preliminary fact. Thus when a spoken statement is relied upon to prove notice to X, it is without probative value unless X heard it. Or if a letter purporting to be from Y is relied upon to establish an admission by him, it has no probative value unless Y wrote or authorized it. Relevance in this sense has been labeled “conditional relevancy”. Morgan, Basic Problems of Evidence 45-46 (1962). Problems arising in connection with it are to be distinguished from problems of logical relevancy, e.g. evidence in a murder case that accused on the day before purchased a weapon of the kind used in the killing, treated in Rule 401. ”

La participación del jurado en la determinación de cuestiones preliminares de pertinencia condicionada obedece a que, tratándose de una mera cuestión de hecho, poner exclusivamente en el juez la determinación de la cuestión, menoscaba la función del jurado como juzgador de los hechos. Esto me parece cierto sólo cuando ese hecho es también un hecho último, esencial para la determinación de un elemento de la causa de acción, acusación o defensa. ”

Ernesto L. Chiesa, Tratado de Derecho Probatorio, Publicaciones JTS, tomo II, 1998, págs. 1218-1219 (escolios omitidos).
Si la evidencia presentada por el proponente puede ser estimada por un juzgador de hechos como suficiente para sostener que la evidencia es lo que el proponente sostiene que es, el tribunal debe admitirla. El tribunal debe recibir la prueba del proponente y hacer una determinación preliminar. Nótese el rol modesto del juez, en casos por jurado, quien hace la determinación de si el juzgador de hechos ha de recibir o no la evidencia. Sin embargo, cuando un acusado es procesado por tribunal de derecho le corresponde al juez no sólo ser el juzgador de hechos, sino también tiene que hacer las determinaciones preliminares de admisibilidad de prueba.
A la luz de lo anteriormente expresado, resulta evidente que no erró el foro aquí recurrido al denegar la solicitud de supresión presentada por el peticionario y permitir que la evidencia pase al juzgador de hechos para que éste estime su valor probatorio durante el juicio. Ello, porque la controversia planteada por el peticionario afecta más el valor probatorio de la evidencia que su admisibilidad. En Pueblo v. Bianchi, 117 D.P.R. 484, 492 (1986), nuestro Tribunal Supremo expresó que “cualquier duda que surja respecto a la posible adulteración o contaminación de la evidencia se dirige al peso y no a la admisibilidad de la prueba.”
En el acto del juicio, el acusado-peticionario tendrá toda oportunidad para presentar la prueba que estime pertinente para impugnar el valor probatorio de la evidencia que presente el ministerio fiscal.
En consideración a lo expuesto, se expide el auto solicitado y se confirma la resolución recurrida.
Notifíquese inmediatamente a todas las partes recurridas y al Tribunal de Primera Instancia.
*363 Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Vélez Yélez,
Secretaria del Tribunal de Apelaciones